Oral argument not yet scheduled

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## for the 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 of ℭ𝔬𝔩𝔲𝔪𝔟𝔦𝔞 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

_____

No. 12-7077

_____

CHARLES SINGLETARY,

*Plaintiff-Appellee*,

v.

DISTRICT OF COLUMBIA

*Defendant-Appellant*.

_____

On Appeal from the
United States District Court for the District of Columbia

_____

**Brief for Appellee**

|  |  |
|---|---|
| | Neal Goldfarb |
| Stephen C. Leckar | Butzel Long Tighe Patton, PLLC |
| 1850 M St., NW, Suite 240 | 1747 Pennsylvania Ave., NW, Suite 300 |
| Washington, DC 20036 | Washington, D.C. 20006 |
| (202) 742-4242 | (202) 454-2826 |
| steve@leckarlaw.com | ngoldfarb@bltplaw.com |
| | |
| Edward Sussman | Steven R. Kiersh |
| 601 Pennsylvania Ave., NW | 5335 Wisconsin Ave., N.W. |
| Suite 900-South Building | Suite 440 |
| Washington, D.C. 20004 | Washington, D.C. 20015 |
| (202) 737-7110 | (202) 347-0200 |
| edwardsussman@yahoo.com | skiersh@aol.com |

*Counsel for Plaintiff Charles Singletary*

## Certificate as to Parties, Rulings, and Related Cases

*Parties.* The plaintiff/appellee is Charles Singletary. The defendant/appellant is the District of Columbia. There are no intervenors or *amici*.

*Ruling under review.* The District of Columbia has stated that it is seeking review of the jury verdict and judgment entered on December 12, 2011 (DE 69, 73), and all orders merged therein, including the following:

- the order entered on February 18, 2010 denying the District's motion to dismiss (DE 16-17, *Singletary v. District of Columbia*, 685 F. Supp. 2d 81 (D.D.C. 2010));

- the order entered on August 1, 2011 denying the District's motion for summary judgment and granting plaintiff's motion for partial summary judgment on liability (DE 40-41, *Singletary v. District of Columbia*, 800 F. Supp. 2d 58 (D.D.C. 2011));

- the order entered on October 7, 2011 denying the District's motion for reconsideration of the court's August 1, 2011 order (DE 48-49); and

- the order entered on July 17, 2012 denying the District's motion for new trial or, in the alternative, for remittitur (DE 82, *Singletary v. District of Columbia*, 876 F. Supp. 2d 106 (D.D.C. 2012).

*Related cases.* This case has not previously been before this Court or any other court, except the district court below. This case is related to Singletary's habeas corpus case, which was before this Court in *Singletary v. Reilly*, 452 F.3d 868 (D.C. Cir. 2006).

# Contents

Table of Authorities ....................................................................................v

Glossary ...................................................................................................ix

Counterstatement of the Issues ...................................................................1

Counterstatement of Facts..........................................................................3

    A. The District's failure to timely raise the issue of causation ...........................3

    B. The grant of summary judgment as to causation...........................................5

    C. The evidentiary rulings challenged by the District ........................................8

        1. Evidence offered for the purpose of showing that if Singletary's parole had not been revoked, he would have violated his terms of parole and been reincarcerated. ...........................9

        2. Evidence regarding Singletary's eyesight. .............................................10

        3. Evidence that Singletary was supposedly ticketed for speeding. .............12

Summary of Argument ..............................................................................15

Standard of Review....................................................................................21

Argument...................................................................................................21

    I. Singletary's claim is not barred by either the *Rooker-Feldman* doctrine or issue preclusion. .......................................................................21

        A. *Rooker-Feldman* is inapplicable............................................................21

        B. The defense of issue preclusion was forfeited and in any event is without merit. ..........................................................24

    II. The District is subject to liability under *Monell*. .........................................26

        A. The Board of Parole was the District's final policymaker regarding parole.................................................................28

1.  The Board had full authority over parole revocation, and was not constrained by policies "not of its own making."..............................................................28

2.  The Board's status as final policymaker was not affected by the D.C. Council's power to disapprove regulations regarding parole................................32

3.  The availability of habeas review is similarly irrelevant. ................33

4.  The revocation of Singletary's parole did not violate District of Columbia policy................................35

5.  The quasi-judicial nature of revocation decisions is irrelevant................................................36

B.  The District has not been held liable on the basis of respondeat superior................................37

C.  The District is not entitled to quasi-judicial immunity. .........................39

III. Singletary's parole was revoked without due process...................................47

A.  This Court has already held that Singletary was denied due process. ................................................47

B.  The habeas proceedings and the new revocation hearing did not provide the process that was due.................................50

IV.  The exclusion of evidence about the Houtman murder was appropriate. ..............................................56

A.  The question whether Singletary's parole would have been revoked had he received due process was resolved on summary judgment. ................................57

B.  The District forfeited the right to argue that Singletary's parole would have been revoked even if he had received due process. ..............................60

V.  The other evidentiary rulings were within district court's discretion................................................61

A. The court properly excluded evidence offered for the
purpose of showing that if Singletary's parole had not been
revoked, he might have violated his terms of parole and
been reincarcerated. ................................................................61

B. Any objections to the other rulings are forfeited. ..................................63

Conclusion ..............................................................................64

Addendum

Parole Board regulations (28 D.C.M.R. §§ 100–2230) .....................................A1

D.C. Board of Parole, Notice of Final Rulemaking, 32 D.C. Reg.
1511 (March 15, 1985) (excerpts) ................................................A25

Mayor's Order 89-10, 36 D.C. Reg. 1254 (Feb. 10, 1989) .............................A30

# Table of Authorities

## Cases

*Anyanwutaku v. Moore*, 151 F.3d 1053 (Cir. 1998) ................................44

*Auger v. D.C. Bd. of Appeals & Review*, 477 A.2d 196 (D.C. 1984)......................25

*Austin Municipal Securities, Inc. v. National Association of Securities Dealers*, 757 F.2d 676 (5th Cir. 1985)........................................45

*Banks v. District of Columbia*, 377 F. Supp. 2d 85 (D.D.C. 2005) ........................27

*Bennett v. Ridley*, 633 A.2d 824 (D.C. 1993) ....................................35, 52

*Bigford v. Taylor*, 834 F.2d 1213 (5th Cir. 1988)........................................39

*Brack v. Ortiz*, No. 05-cv-02658, 2007 WL 867992 (D. Colo. March 20, 2007) ................................................................22

*\*Brewer v. Chauvin*, 938 F.3d 860 (8th Cir. 1991) ................................56

*\*Carey v. Piphus*, 435 U.S. 247, 254-59 (1978)........................................8, 56

*Carr v. Rose*, 701 A.2d 1065 (D.C. 1997)........................................26

*\*City of St. Louis v. Prapotnik*, 485 U.S. 112 (1988) ........................16, 29, 30, 31, 34

*Cooper v. City of Ashland*, 187 F.3d 646 (table), *reported in full*, 1999 U.S. App. LEXIS 14082 (9th Cir. June 22, 1999)..........................45, 46

*Cosgrove v. Thornburgh*, 703 F. Supp. 995 (D.D.C. 1988) ................................29

*Crow v. Penry*, 102 F.3d 1086 (10th Cir. 1996) ........................................44

*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977)........................................24

*Dick v. Watonwan County*, 738 F.2d 939 (8th Cir. 1984)................................38, 39

*D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983)..........................15, 21, 22

*Duncan's Point Lot Owners Ass'n v. FERC*, 522 F.3d 371 (D.C. Cir. 2008) ................................................................64

*\*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005)..............22, 23

*FDIC v. Meyer*, 510 U.S. 471 (1994) ................................................46

*First Tenn. Bank N.A. v. Smith*, 766 F.2d 255 (6th Cir. 1985) ................................25

*Forchion v. Intensive Supervised Parole*, 240 F. Supp. 2d 302 (D.N.J. 2003) ................................................................22, 23

*\*Franklin v. Aycock*, 795 F.2d 1253 (6th Cir. 1986) ................................56

*Gagnon v. Scarpelli*, 411 U.S. 778 (1973)........................................48

*Hampton Co. National Surety LLC v. Tunica County, Miss.*, 543 F.3d 221 (5th Cir. 2008)................................................................31

*\*Haynesworth v. Miller*, 829 F.2d 1245 (D.C. Cir. 1987), *abrogated in part on other grounds*, *Hartman v. Moore*, 547 U.S. 250 (2006)..................41, 42

---

*Authorities principally relied upon are marked with an asterisk.

*Heck v. Humphrey*, 512 U.S. 477 (1994)........................................................43, 44

*Hernandez v. Sheahan*, 455 F.3d 772 (7th Cir. 2006) ...............................42

*Hudson v. Palmer*, 468 U.S. 517 (1984).......................................53, 54, 55

*Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999) ...........24

*Imbler v. Pachtman*, 424 U.S. 409 (1976)....................................................46

*Jett v. Dallas Ind. School Dist.*, 491 U.S. 701 (1989) ........................29, 32

*In re J.M.W.*, 411 A.2d 345 (D.C. 1980) .......................................................22

*K.H. v. R.H.*, 935 A.2d 328 (D.C. 2007)........................................................26

*Kalina v. Fletcher*, 522 U.S. 118 (1997).......................................................46

*Kentucky v. Graham*, 473 U.S. 159 (1985) ...................................................41

*Laurel Bay Health & Rehab. Ctr. v. NLRB*, 666 F.3d 1365 (D.C. Cir.
    2012) ...................................................................................................................63

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination
    Unit*, 507 U.S. 163 (1993)........................................................................40, 41

*Littles v. Bd. of Pardons & Paroles Div.*, 68 F.3d 122 (5th Cir. 1995)......44

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ...............................54

*Maniaci v. Georgetown University*, 510 F. Supp. 2d 50 (D.D.C. 2007) ......27

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ..................................................51

*McClure v. Independent School Dist. No. 16*, 228 F.3d 1205 (10th Cir.
    2000) ...................................................................................................................56

*McCoy v. Holland*, 364 F.3d 166 (4th Cir. 2004)........................................24

*McMillan v. Monroe County*, 520 U.S. 781 (1997)......................................27

*Metromedia Co. v. Fugazy*, 983 F.2d 350 (2d Cir. 1992).........................25

*Mitchell v. Gales*, 61 A.3d 678 (D.C. 2013).................................................26

*Monell v. New York City Department of Social Services*, 436 U.S. 658
    (1978)..........................................................................................................*passim*

*Morrissey v. Brewer, , 408 U.S. 471 (1972)..................................48, 51, 52

*Shebeshi v. United States*, No. 12-356-JEB, 2013 U.S. Dist. LEXIS
    4518 (D.D.C. Jan. 11, 2013).................................................................46, 47

*Nuyen v. Luna*, 884 A.2d 650 (D.C. 2005) ...................................................26

*Owen v. City of Independence*, 445 U.S. 622 (1980)...................39, 40, 43

*Parratt v. Taylor*, 451 U.S. 527 (1981)....................................................53, 54

*Pembaur v. Cincinnati*, 475 U.S. 469 (1986)..........................................*passim*

*Polk County v. Dodson*, 454 U.S. 312 (1981)..............................................38

*Propert v. District of Columbia*, 948 F.2d 1327 (D.C. Cir. 1991) ...........51

*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923).......................15, 21, 22

*Schnitzler v. Reisch*, No. CIV 06-4064, 2008 WL 895834 (D.S.D.
    March 31, 2008)..............................................................................................22

*Settles v. U.S. Parole Comm'n*, 429 F.3d 1098 (D.C. Cir. 2005)...............45

*Shin v. Portals Confederation Corp.*, 728 A.2d 615 (D.C. 1999) ............26

*Singletary v. Reilly*, 452 F.3d 868 (2006) .............................................19, 26, 48, 49

*Skinner v. Switzer*, 131 S. Ct. 1289 (2011) ............................................................23

*Spencer v. Kemna*, 523 U.S. 1 (1998)....................................................................44

*Teachey v. Carver*, 736 A.2d 998 (D.C. 1999) ......................................................29

*Teed v. Hilltown Twp.*, No. 03-cv-6040, 2004 U.S. Dist. LEXIS
    9477(E.D. Pa. May 20, 2004) ............................................................................42

*Threatt v. Winston*, 907 A.2d 780 (D.C. 2006) ......................................................26

*Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, No. 99-152,
    1999 U.S. Dist. LEXIS 15846 (E.D. La. Oct. 8, 1999) .....................................42

*United States v. Anderson*, 407 Fed. Appx. 487 (D.C. Cir. 2011) ........................25

*United States v. Baugham*, 449 F.3d 167 (D.C. Cir. 2006) ...................................63

*United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010)...........................................61

*United States v. Lucas*, 499 F.3d 769 (8th Cir. 2007) ...........................................61

*United States v. Martin*, 618 F.3d 705 (7th Cir. 2010) ..........................................61

*United States v. Watson*, 409 F.3d 458 (D.C. Cir. 2005).......................................21

*Valle v. City of Houston*, 613 F.3d 536 (5th Cir. 2010).........................................31

*Verizon Maryland Inc. v. Public Service Comm'n*, 535 U.S 635 (2002) ...............22

*Waters v. City of Chicago*, 580 F.3d 575 (7th Cir. 2009).......................................31

*Weaver v. Tex. Capital Bank N.A.*, 660 F.3d 900 (5th Cir. 2011) ..........................25

*White v. Gittens*, 121 F.3d 803 (1st Cir. 1997) ......................................................44

*Wilson v. Marshall Indep. Sch. Dist.*, No. 2:09-CV-273-DF-CE, 2011
    U.S. Dist. LEXIS 40598 (E.D. Tex. Feb. 1, 2011)............................................42

*Zinermon v. Burch*, 494 U.S. 113 (1990)...............................................53, 54, 55

## Statutes, Regulations, and Orders

28 U.S.C. § 1738.....................................................................................................25

28 U.S.C. § 2241 ....................................................................................................49

28 U.S.C. § 2241(c)(3)......................................................................................35, 49

42 U.S.C. § 1983 ..............................................................................................*passim*

D.C. Code:

    § 1-206.02(c) (formerly § 1-233(c)) ..................................................................33

    § 16-1906 ...........................................................................................................35

    § 24-201.03 (Repl. 1989), *redesignated as* D.C. Code § 24-401.03
        (2001)...........................................................................................................29

    § 24-201.1(a) (Repl. 1989), *redesignated as* D.C. Code § 24-
        401.01(a) (2001) .........................................................................................38

*   § 24-201.2(a) (Repl. 1989), *redesignated as* D.C. Code § 24-
        401.02(a) (2001) .........................................................................................28

§ 24-201.2(a)(4) (1989 Repl.), *redesignated as* § 24-401(a)(4) (2001) ..........................................................................54

§ 24-201.2(c) (Repl. 1989), *recodified as* D.C. Code § 24-401.02(c) (2001) .............................................................32, 33

§ 24-201.2(d) (Repl. 1989), *recodified as* D.C. Code § 24-401.02(d) (2001) .........................................................................32

\* § 24-201.3 (Repl. 1989), *redesignated as* D.C. Code § 24-401.3 (2001) ..........................................................................29, 33

§ 24-206 (1989 Repl.), *redesignated as* § 24-406 (2001) ............33

28 D.C.M.R.:

§§ 217-220 (1987) ...............................................................54

§ 219 (1987) ...................................................................30, 35

§ 219.1(b) (1987) ..................................................................35

§ 219.6(e) (1987) ..................................................................35

D.C. Law 7-103, § 4, 34 D.C. Reg. 8279 (April 28, 1988) ...........30

\*Mayor's Order 89-10 (Jan. 6, 1989), *in* 36 D.C. Reg. 1254 (Feb. 10, 1989)........................................................................29

\*32 D.C. Reg. 1511 (March 15, 1985) ...........................................30

## Court Rules

\*D.C. LCvR 7(h)(1) ........................................................................7, 58

Fed. R. App. P.:

\* Rule 28(a)(5) .................................................................24, 61, 63

\* Rule 28(a)(9)(A) .......................................................................63

Fed. R. Ev.:

\* Rule 403 .............................................................................11, 51

Rule 404 .....................................................................................62

Rule 404(a)(1) ............................................................................62

Rule 404(b)(1) ............................................................................62

Rule 608 .....................................................................................13

## Miscellaneous

2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 33.3 (6th ed. 2011)....................................50

Pl. Opp. to D.C. Mtn. to Dismiss, *Shebeshi v. United States*, No. 12-356-JEB (D.D.C. filed Jan. 9, 2013) (DE 44) ..................47

Restatement (3d) of Agency § 2.04 .............................................37

\*Restatement (2d) of Judgments § 15...................................25, 26

**Glossary**

12/6 Tr.      Transcript of trial proceedings on December 6, 2011

12/7 Tr.      Transcript of trial proceedings on December 7, 2011

12/8 Tr.      Transcript of trial proceedings on December 8, 2011

DE            Docket Entry (in the district court)

DMV           Department of Motor Vehicles

ECF pp.       Page numbers in a document filed with the district court as
              indicated by the ECF header.

## Counterstatement of the Issues

1. a. Whether the *Rooker-Feldman* doctrine deprived the district court of subject-matter jurisdiction, where (a) this Court had previously held, upon habeas review, that Singletary's parole had been revoked without due process, and the district court merely applied that decision, and (b) the injury for which Singletary sought damages was caused by a decision of an executive agency of the District of Columbia, not by a D.C. court.

b. Whether, despite this Court's decision granting Singletary habeas relief, Singletary's claim is precluded by the previous decisions of the D.C. courts that had denied such relief.

2. a. Whether the decision of the District of Columbia Board of Parole (a three-member executive agency) to revoke Singletary's parole, made on the record after an evidentiary hearing, is attributable to the District of Columbia for purposes of liability under 42 U.S.C. § 1983.

b. Whether the District is entitled in this case to an exception to the general rule that municipalities are not immune to suit under 42 U.S.C. § 1983 in situations in which official immunity would protect the individual municipal officers responsible for the challenged action.

3. Whether this Court held in Singletary's habeas case that Singletary's parole was revoked without due process, and if so whether the District is provided

with a defense based on the fact that Singletary obtained habeas relief and that he
received a new hearing ten years after his parole was revoked.

4. Whether evidence on the issue of causation was properly excluded at trial,
based on one or more of the following reasons:

    a. The issue had been resolved on summary judgment.

    b. The District forfeited the right to argue the issue by failing to properly
raise it below.

    c. The District was precluded from relitigating the issue of causation by
the decision in Singletary's second revocation hearing.

5. Whether the following rulings were within the district court's discretion:

    a. The exclusion of evidence that Singletary allegedly committed a
crime after being released again on parole, where the evidence was
offered to show that if Singletary's parole had not been revoked in
1996, it might have eventually been revoked anyway.

    b. The admission and exclusion of evidence relating to Singletary's loss
of his eyesight while he was in prison, where Singletary was not
seeking to hold the District liable for that loss.

    c. The exclusion of evidence that Singletary received a speeding ticket
after he was re-paroled, where the evidence contained multiple
hearsay that was not within any exception to the hearsay rule.

-2-

## Counterstatement of Facts

The District's statement of facts discusses many matters that are not relevant to its arguments, and omits many facts that *are* relevant. Although the District complains about the exclusion of evidence by which it hoped to show that Singletary's parole would have been revoked even if he had received due process, it fails to disclose that it did not raise that issue until the eve of the trial or that the issue had already been resolved by the entry of summary judgment on liability. In addition, the District fails to provide all the facts relevant to its other challenges to the district court's evidentiary rulings.

This counterstatement is intended to supply the relevant facts that the District has left out. Given limitations of space, we do not deal with factual matters that the District discusses in its statement of facts but not in the "Argument" section of its brief; as is discussed in the final section of this brief, those issues have not been preserved or properly presented for review.

### A. The District's failure to timely raise the issue of causation

As the district court noted, the argument that Singletary's parole would have been revoked even if he had been afforded due process was first raised in "an opposition…filed on a Friday night before a Tuesday trial."[1] During earlier stages of the litigation, the District had repeatedly failed to raise the issue.

_____

1.   DE 63 at 5.

*The District's answer.* The District did not raise the causation issue in its answer.[2] The complaint had alleged that Singletary was not involved in the murder of Leroy Houtman;[3] the District's response in its answer was that it lacked knowledge or information sufficient to admit or deny the allegation but that "at the time of plaintiff's parole revocation, the District believed that plaintiff was involved in Mr. Houtman's murder."[4] The causation issue was not raised as an affirmative defense.[5]

*Summary judgment.* As discussed in more detail below, although the issue of causation was prominently raised in Singletary's motion for summary judgment as to liability, the District did not address the issue in its opposition. Nor did the District dispute the assertion in Singletary's statement of material facts not in dispute that he had not killed Houtman and had not been involved in the murder.

*Pretrial statement.* The District did not raise the causation issue in the joint pretrial statement. Although the District asserted no less than 22 defenses in the pretrial statement, it did not contend that Singletary's parole would have been

---

2.   DE 21.

3.   DE 1, ¶ 11.

4.   DE 21, ¶ 11. However, the District did deny the allegation that Singletary had been seriously injured as a proximate result of having his parole revoked. (DE 12, ¶ 59( answer); *see* DE 1, ¶ 59 (complaint)

5.   DE 21.

-4-

revoked even if he had received due process.[6] Nor did the District submit a jury instruction on the issue.[7]

Despite the District's failure to assert lack of causation as a defense, its witness and exhibit lists indicated that the District intended to put on evidence that it hoped would implicate Singletary in the Houtman murder.[8] Singletary filed a motion in limine seeking to bar that evidence, and it was in its opposition to that motion—filed two business days before the trial started—that the District first argued that Singletary's parole would have been revoked even if he had received due process.[9]

## B. The grant of summary judgment as to causation

The issue of causation was unmistakably put into play by Singletary's motion for summary judgment as to liability, but the District did not take up the challenge.

---

6.  DE 54 at 6-8; DE 58 at 5-7. The District's list of defenses was not limited to true affirmative defenses, as to which the District would have the burden of proof, but included matters as to which the burden of proof was on Singletary. The list did include a reference to causation, but the supporting citation to *Monell* shows that the reference concerned the question whether the constitutional violation alleged by Singletary was imputable to the District and was therefore caused *by the District*. (DE 54 at 7; DE 58 at 6.)

7.  DE 54 at 33-34, 58 at 33-34.

8.  DE 54 at 11-13, 20; DE 58 at 11-13, 20-21.

9.  DE 60 at 7-11.

-5-

The memorandum supporting Singletary's motion included a section entitled, "The Parole Board's constitutional violation was the proximate cause of Singletary being unjustly imprisoned for ten years."[10] In that section, Singletary argued that the District could defeat liability if it could show that his parole would have been revoked even if he had received due process.[11] He argued that the District could not make such a showing, and in support of that argument he submitted a declaration in which he stated that he was not involved in the murder.[12] Singletary's statement of material facts not in dispute similarly said, "Singletary did not kill Houtman and was not involved in Houtman's murder."[13]

In its opposition to Singletary's motion, the District did not deal with this argument. It did not dispute the assertion in the Statement of Material Facts that Singletary had not been involved in the murder; instead, it stated that the assertion "is not material to the issue as to whether the District can be subjected to municipal liability for plaintiff's claims pursuant to 42 U.S.C. § 1983."[14]

---

10.  DE 32 at 18.

11.  DE 32 at 18-19.

12.  DE 32-3, ¶ 5.

13.  DE 32, ¶ 4.

14.  DE 34 at 17.

Under the district court's local rules, that failure to contest the issue meant that Singletary's lack of involvement in the murder was admitted.[15] And consistent with that conclusion, the District did not argue that there was a dispute of fact as to whether Singletary had participated in Houtman's murder or about whether Singletary's parole would still have been revoked if he had been afforded due process.[16]

Singletary's motion for summary judgment on liability was granted.[17] Although the district court's opinion did not discuss the issue of causation, there was no reason for it to have done so, since the issue was not contested.

In its subsequent decision excluding evidence offered by the District to show that Singletary's parole would have been revoked even if he had received due process, the court indicated that it regarded that issue as having been resolved by its grant of summary judgment as to liability. It described causation as a "factual issue underlying liability" and it thought that to admit the evidence would be to "reopen the question of liability."[18]

---

15. D.D.C. LCvR 7(h)(1) ("In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").

16. DE 34 at 13.

17. DE 40, 41.

18. DE 63 at 6, 7.

Similarly, in its decision denying the District's motion for a new trial, the district court said that Singletary's summary-judgment motion had "demonstrated [the] correct understanding that the causation issue related to liability[.]"[19] The court went on to note that "the District never asserted during the liability phase of this action that under the *Carey v. Piphus* line of cases [which allow defendants to avoid liability by showing that they would have taken the same action even if the constitutional violation had not occurred], plaintiff could not establish causation."[20] The court therefore said that it "properly concluded that plaintiff's alleged involvement in the murder, or his alleged commission of other offenses while on parole, were not matters to be explored in the damages phase of the case."[21]

## C. The evidentiary rulings challenged by the District

Although the District's statement of facts describes a number of evidentiary rulings that it lost, only a few of those rulings are addressed in the District's argument. We describe those rulings here.

---

19.  DE 82 at 11.

20.  *Id.* at 12.

21.  *Id.*

### 1. Evidence offered for the purpose of showing that if Singletary's parole had not been revoked, he would have violated his terms of parole and been reincarcerated.

As the District says in its brief, it "sought to present evidence to show that, had the Board not revoked Singletary's parole in 1996, he might have violated the terms of his parole and been returned to prison in any event, such that he would not be entitled to compensatory damages for the entire ten-year period."[22] Specifically, the District wished to present evidence of Singletary's criminal record, including charges on which he was arrested but not convicted.[23]

This evidence was excluded on the grounds that it was irrelevant, that whatever probative value it might have had was substantially outweighed by the risk of unfair prejudice, and that it was not admissible for purposes of impeachment.[24] The district court concluded that the District's purpose in offering the evidence was to show that Singletary was a person of bad character.[25]

---

22. D.C. Br. at 23.

23. DE 60 at 10-12.

24. DE 63 at 1-3.

25. *Id.* at 2 n.1.

-9-

## 2. *Evidence regarding Singletary's eyesight.*

While Singletary was in prison after his parole was revoked, he developed glaucoma and lost much of his eyesight.[26] Although Singletary did not seek to hold the District for the loss of his vision, he testified about that subject and introduced copies of medical requests relating to his vision that he had submitted during his imprisonment.[27] The jury was instructed that that he was not seeking to hold the District liable for the loss of his eyesight and that this evidence was offered only to show what Singletary experienced while he was imprisoned after his parole was revoked.[28]

The District sought to introduce a nursing note regarding a medical visit by Singletary while he was being held in the D.C. jail in 2006.[29] The note stated, "Pat. [sic] was seen by opth. o11-1-06 [sic] and Xalantan added to his med. He is requesting to be place [sic] in gen pop. states that he had existed in the past 10 y in gen. pop, and does not need to be in med, 82."[30]

---

26.  12/6 Tr. 153-54.

27.  *Id.*; 12/7 Tr. 31-55; Pl. Ex. 1, 2, 4, 7, 8, 10, 12, 13, 17, 22, 26.

28.  *E.g.*, 12/7 Tr. 32-33; 12/12 Tr. 57-58.

29.  Def. Ex. 16.

30.  *Id.*

-10-

In a pretrial ruling, the district court excluded the document under Fed. R.
Ev. 403, on the ground that "the limited relevance of the statement is substantially
outweighed by the danger of unfair prejudice ..., since the document reflects the
fact that the plaintiff was incarcerated at a time and under circumstances that have
no bearing on the issues to be decided by the jury."[31] The court also stated that it
would not be possible to assess the significance of Singletary's preference for
being housed with the general population "absent some evidence of the conditions
that pertained during his confinement at the infirmary—a matter which will not be
part of the record."[32]

Despite the ruling *in limine* that the document was inadmissible, the district
court said that the statements by Singletary that were referred to in the nursing
notes "may be grist for cross examination," and said that it "will consider whether
the document should be admitted—minus the date—to complete the impeachment,
if necessary."[33]

However, the issue never came up during the trial, because the District did
not question Singletary about the statements that were recorded in the nursing note.

---

31. DE 59 at 3.

32. *Id.*

33. *Id.* at 4.

-11-

### 3.  Evidence that Singletary was supposedly ticketed for speeding.

Singletary was asked on cross examination whether he had received a speeding ticket in Virginia in September 2009 (i.e., after he had been released following this Court's habeas decision).[34] His answer was no.[35] The District subsequently sought to introduce Singletary's driver's record from the D.C. Department of Motor Vehicles, which stated that he had been cited in Virginia for speeding on the date in question.[36] During the pretrial conference, that document had been held to be inadmissible.[37] However, the District argued that the document was admissible to impeach Singletary's testimony that he had not been ticketed.[38]

The district court asked, "How do we know, given the cameras that can be used for speeding tickets, that he got this speeding ticket? … [H]ow do we know that he was driving the car?"[39] Counsel for the District responded that the document reflected that points had been assessed against Singletary's driving record.[40]

---

34.  12/8 Tr. 56.

35.  *Id.* at 57.

36.  *Id.* at 93-94; Def. Ex. 24.

37.  DE 59 at 4.

38.  12/8 Tr. 94-95.

39.  *Id.* at 95, 96.

40.  *Id.* at 96.

Singletary's counsel then pointed out that there was not an adequate foundation for

admitting the document:

> [T]his [the alleged citation] was a Virginia action. This [the
> document] is not a Virginia record. So what it is is in [sic] D.C.
> getting some information from Virginia, and we don't know
> how that information is compiled in Virginia, and recording it
> on their own D.C. records. … It's not a record that's contem-
> poraneously made at the time of the event or by someone who
> has knowledge of the actual events.[41]

The district court repeated its concern about whether the document showed

the Singletary had in fact been driving in Virginia on the day of the citation.[42] The

court stated, "Prior to the advent of cameras, I might be able to draw some con-

clusions to [sic] the fact of the citation but I really can't."[43] After further colloquy,

the court concluded that since the District's sponsoring witness was someone from

*the District's* Department of Motor Vehicles, not Virginia's, it did not believe that

"there's enough information on this piece of paper to tell us [that Singletary had

been behind the wheel]."[44] The court added, "If you have something better than

---

41. *Id.* at 97. Singletary's counsel also noted that the document was inadmissible
for purposes of impeachment on the ground that Fed. R. Ev. 608 does not
permit the introduction of extrinsic evidence of specific acts of conduct when
offered for that purpose. *Id.* at 94.

42. *Id.* at 97, 99.

43. *Id.* at 99.

44. *Id.* at 102.

-13-

this, if you have something from Virginia, that is more helpful to the point then this, I'll entertain it, but—"[45]

After a break the District tried again to get the court to admit the document.[46] The district court reiterated its concern that the document, standing alone, did not establish that Singletary had in fact been driving:

> MR. JEFFERSON [counsel for the District]: … We're talking about him saying one thing on the stand and us having evidence directly contradictory to that thing he said.
>
> THE COURT: That's my problem; I don't know that it is directly contradictory to what he said.
>
> MR. JEFFERSON: We ought to be able to get the witness [from the D.C. DMV] on the stand and have him talk about it.
>
> THE COURT: Well, the witness doesn't know. The DMV witness has no idea. All he knows is that something that Virginia said, he paid the ticket.[47]

After further colloquy, the court reaffirmed its exclusion of the document.[48]

However, the court stated that it would be "a different matter" if the District had

---

45. *Id.* at 102-03.

46. *Id.* at 106-116.

47. *Id.* at 113.

48. *Id.* at 114.

"some authentic public record in the records of the State of Virginia that would give us more clarity as to what happened[.]"[49]

## Summary of Argument

1a. The district court was not deprived of jurisdiction by the *Rooker-Feldman* doctrine. Two of the conditions for the doctrine's application were absent. First, Singletary was not seeking relief for an injury caused by a judgment of the D.C. courts. Rather, his injury was caused by the revocation of his parole by the Board of Parole, which is an executive agency. Because parole is an executive function, parole-revocation decisions are not subject to *Rooker-Feldman*. And because Singletary's claim arose independently of the D.C. courts' denial of habeas relief, the *Rooker-Feldman* doctrine is not brought into play by the mere fact that the D.C. courts had previously ruled on the revocation's validity.

Second, Singletary's claim did not require the district court to review and reject any decision of a D.C. court. Rather, it called on the district court to apply this Court's habeas decision, which had held that Singletary's parole had been revoked without due process. Furthermore, the district court did no more than Singletary asked: It applied this Court's decision, without deciding anew whether Singletary had been denied due process.

---

49. *Id.*

-15-

b. Singletary's claim that his parole was revoked unconstitutionally was not precluded by the D.C. courts' denial of his habeas petitions. The defense of issue preclusion was not raised below and was therefore forfeited. And even if this Court has discretion to consider issue preclusion *sua sponte*, exercising that discretion would not be appropriate here. The case was already fully litigated in the district court, and applying issue preclusion would mean that the jury trial and other pro-ceedings below were a waste of time.

In addition, the District's preclusion argument fails on the merits. Whatever preclusive effect the D.C. courts' decisions otherwise had was eliminated by this Court's decision granting Singletary's habeas petition.

2a. The District of Columbia can be held liable under 42 U.S.C. § 1983 for the Board of Parole's unconstitutional action. Under *Pembaur v. Cincinnati*[50] and *City of St. Louis v. Prapotnik*,[51] municipalities may be held liable for unconstit-utional actions taken by the person or body having final policymaking authority over the area in question, even if the action is tailored to a particular situation and is not intended to guide future action. The District's final policymaker regarding parole was the Board of Parole, which was responsible for revoking Singletary's parole without due process.

---

50. 475 U.S. 469 (1986).

51. 485 U.S. 112 (1988).

Not only did the Board have broad authority over the subject of parole generally, but the Board's chairman had the power (delegated by the mayor pursuant to a statutory grant of rulemaking authority) to promulgate regulations implementing and administering the parole laws. While this power was vested in the chairman rather than the Board as a whole, it is appropriate to regard the policymaker as being the Board as a whole. The inquiry focuses on where policymaking authority actually lies, not where it formally resides. And the regulations governing parole revocation were promulgated by the Board itself. And in any event rulemaking power is internal to the Board, and is not vested in some higher body.

This is true even though the District Council had the power to disapprove regulations promulgated by the Chairman. Policies established by executive agencies or officers can *always* be overridden by the municipal legislature, but that possibility does not prevent such agencies and officers from being policymakers for purposes of *Monell*.[52]

Nor is the result changed by the availability of habeas review. The review-ability of a challenged decision is relevant to the *Monell* analysis only to the extent that the reviewing body is the real policymaker. The District here does not suggest that courts exercising habeas jurisdiction were its policymakers regarding parole

---

52.  *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

revocation. Moreover, habeas does not provide *effective* review for purposes of *Monell*, because habeas does not provide a vehicle for reviewing parole-revocation decisions on the merits and because it is not available until after the revocation of parole becomes final.

The quasi-judicial nature of parole revocation is also irrelevant. The appropriate question here is not whether the decision revoking Singletary's parole *established* D.C. policy, but whether the Board of Parole was the District's final policymaker. If the Board was in fact the policymaker, its revocation decision is imputed to the District.

b. Underlying *Monell*'s "policy or custom" requirement is the more fundamental requirement that municipal liability under § 1983 be based on something more than just respondeat superior. The judgment against the District here satisfies that requirement. Respondeat superior imposes liability on an employer for torts caused by its employees. But Singletary's parole was revoked by the official action of an agency—the Board of Parole—not by the action of individual employees. The judgment against the District is therefore based on more than the mere "existence of an employer-employee relationship with a tortfeasor[.]"[53]

c. The District is not protected by the quasi-judicial immunity that protects the individual members of the Board of Parole. *Monell* held that municipalities are

---

53.  *Monell*, 436 U.S. at 692.

not immune from suit under § 1983, and subsequent decisions have confirmed that municipalities are not derivatively protected by the personal immunities to which their individual officers may be entitled. And even if the question were still an open one, there is no reason to fear the dire consequences that, according to the District, will result from allowing the judgment here to stand.

3. Contrary to what the District contends, this Court has already held that Singletary's parole was revoked without due process. This is clear, first of all, from what the decision said: The Court relied on decisions spelling out the due-process requirements for revoking parole, and held that the evidence at Singletary's revocation hearing did not satisfy those requirements. The Court went on to explain that the multiple hearsay evidence was not sufficiently reliable "to ensure fundamental due process rights."[54]

Moreover, the Court's decision must have been based on the conclusion that Singletary had been denied due process, because there was no other possible basis for it. The Court's power to grant a habeas relief was limited to cases in which the petitioner was being held in custody in violation of federal law. And the possible only basis in federal law for holding Singletary's confinement to be unlawful was the Due Process clause of the Fifth Amendment.

---

54. *Singletary v. Reilly*, 452 F.3d 868, 874 (2006) (internal quotation marks and citation omitted).

4. The district court acted appropriately in excluding the evidence by which the District sought to prove that Singletary was involved in Leroy Houtman's murder and that his parole would therefore have been revoked even if he had been afforded due process. As the district court correctly held, that question had been resolved on summary judgment: The issue had been clearly raised in Singletary's summary-judgment motion, and the District had not disputed Singletary's evidence that he had not been involved in the murder. That issue was therefore beyond the scope of the trial.

Furthermore, the District forfeited the defense that Singletary's parole would have been revoked even if he had received due process. It failed to assert that defense in its answer or—even more important—in the joint pretrial statement. It did not raise the issue until its opposition to Singletary's motion in limine, which it filed barely two business days before the trial. This failure to timely raise the defense is enough by itself to justify excluding the District's evidence.

5. None of the District's other challenges to the district court's evidentiary rulings has any merit. To begin with, the challenges have not been properly raised. None of these other rulings is mentioned in the District's statement of issues, and with one exception the District gives no reasons for its challenge and cites no supporting authority. And many of the rulings discussed in the District's statement of facts are not mentioned at all in its argument.

-20-

The one ruling that the District actually offers an argument about was well within the district court's discretion. The evidence was offered for an improper purpose: to attempt to show that Singletary had a propensity toward criminal conduct and that if his parole had not been revoked he might eventually have re-offended and had his parole revoked anyway. Moreover, the inferences that the District wanted the jury to draw would have required speculation about what might have happened in a counterfactual world in which Singletary's parole was not revoked.

### Standard of Review

Although the District challenges various evidentiary rulings, it fails to state the relevant standard of review, which is the abuse-of-discretion standard.[55]

### Argument

**I.   Singletary's claim is not barred by either the *Rooker-Feldman* doctrine or issue preclusion.**

*A.   Rooker-Feldman is inapplicable.*

Contrary to what the District contends, the *Rooker-Feldman* doctrine[56] does not apply here. The doctrine "is confined to cases … brought by state-court losers complaining of injuries caused by state-court judgments rendered before the dis-

---

55.  *E.g.*, *United States v. Watson*, 409 F.3d 458, 462 (D.C. Cir. 2005).

56.  *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923).

trict court proceedings commenced and inviting district court review and rejection of those judgments"[57] Those conditions do not apply here.

*First*, Singletary does not complain of an injury "caused by [a] state-court judgment[."] Rather, he complains of an injury caused by an action of the D.C. Board of Parole—an executive agency, not a court.[58] Because parole is an executive function, the *Rooker-Feldman* doctrine does not apply to actions challenging parole-revocation decisions.[59] And while it is true that the D.C. courts failed to remedy the injury inflicted by the Board of Parole, they did not *cause* the injury; Singletary would have suffered the same injury even if he had never sought habeas relief.

Even assuming that Singletary's claim required the district court to decide the same issue that was raised in the D.C. courts (and as discussed below, it did not), that would not trigger *Rooker-Feldman.* As the Supreme Court has held, "If a federal plaintiff present[s] [an] independent claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired

---

57. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

58. *In re J.M.W.*, 411 A.2d 345, 348-49 (D.C. 1980).

59. *E.g.*, *Schnitzler v. Reisch*, No. CIV 06-4064, 2008 WL 895834 at *1 (D.S.D. March 31, 2008); *Brack v. Ortiz*, No. 05-cv-02658, 2007 WL 867992 at *8 (D. Colo. March 20, 2007); *Forchion v. Intensive Supervised Parole*, 240 F. Supp. 2d 302, 306 (D.N.J. 2003). *See Verizon Maryland Inc. v. Public Service Comm'n*, 535 U.S 635, 644 n.3 (2002) (*Rooker-Feldman* doctrine does not apply to review of executive action).

-22-

between the parties in state court."[60] Singletary's claim for damages arising from the Parole Board's action is precisely such an "independent claim."

*Second*, Singletary's claim did not invite the district court to review and reject any decision by a D.C. court. Even if reviewing the Board of Parole's action was tantamount to reviewing the D.C. courts' rejection of Singletary's habeas petition, that review had already occurred when Singletary filed suit. Specifically, it occurred as part of this Court's decision granting Singletary's habeas petition—a decision that the Court was statutorily authorized to render despite *Rooker-Feldman*.[61]

Consequently, Singletary did not ask the district court to decide for itself whether Singletary's parole had been revoked without due process. Rather, he asked the court to follow and apply this Court's decision.[62] Singletary first made this point in his opposition to the District's motion to dismiss, where he argued that this Court had "already decided the [due process] issue in [his] favor" and that this Court's habeas decision was "functionally equivalent to the grant of summary judgment for Singletary on the due-process issue."[63] This point was reiterated in

---

60. *Skinner v. Switzer*, 131 S. Ct. 1289, 1297 (2011) (internal quotation marks and citation omitted; alterations in the original).

61. D.C. Br. at 28. *See Exxon Mobil Corp.*, 544 U.S. at 292 n.8 (2005).

62. DE 7 at 45; DE 32 at 8.

63. DE 7 at 4-5.

Singletary's summary-judgment papers.[64] And consistent with this argument, the district court did not re-decide the due-process issue, but merely applied this Court's decision that Singletary's parole had been revoked unconstitutionally.[65]

### B. The defense of issue preclusion was forfeited and in any event is without merit.

**1.** The District argues that even if *Rooker-Feldman* does not apply, the D.C. courts' denial of Singletary's habeas petitions collaterally estops him from arguing that he was denied due process.[66] However, that argument is not properly before the Court. It was not raised below, so it has been forfeited.[67] And beyond that, the argument has not been adequately raised on appeal: It is not included in the District's statement of the issues and is raised only in a footnote.[68]

For these reasons, the Court need not address the District's argument. But even if the Court has discretion to consider issue preclusion *sua sponte*, as the District argues, exercising that discretion here would be inappropriate. Because

---

64. DE 32 at 8.

65. DE 41 at 2-4, 7; DE 49 at 2-3.

66. D.C. Br. at 29-30 n.2.

67. *See, e.g.*, *Dellums v. Powell*, 566 F.2d 167, 178 n.13 (D.C. Cir. 1977); *McCoy v. Holland*, 364 F.3d 166, 172 (4th Cir. 2004).

68. D.C. Br. 5-6, 29 n.2. *See* Fed. R. App. P. 28(a)(5) (appellant's brief must contain "a statement of the issues presented for review"); *Hutchins v. District of Columbia*, 188 F.3d 531, 539, (D.C. Cir. 1999) ("We need not consider cursory arguments made only in a footnote.").

-24-

Singletary's claim has already been fully litigated in the district court, applying issue preclusion at this point could not possibly advance the policy of preventing duplicative litigation, and would mean that the jury trial and other proceedings below were a complete waste of time

**2.** The District's preclusion argument is in any event without merit because this Court's habeas decision deprived the D.C. courts' decisions of whatever preclusive effect they might otherwise have had.

The effect in this case of the D.C. courts' judgments is governed by D.C. law.[69] Although the D.C. Court of Appeals seems not to have addressed the issue, it would most likely follow § 15 of the Restatement (2d) of Judgments, which states, "When in two actions inconsistent final judgments are rendered, it is the later, not the earlier, judgment that is accorded conclusive effect in a third action under the rules of res judicata."[70] The Court of Appeals has cited § 15 in a different

---

69.  28 U.S.C. § 1738.

70.  *See also United States v. Anderson*, 407 Fed.  Appx. 487, 488 (D.C. Cir. 2011); *Weaver v. Tex. Capital Bank N.A.*, 660 F.3d 900, 907 (5th Cir. 2011); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 366 (2d Cir. 1992); *First Tenn. Bank N.A. v. Smith*, 766 F.2d 255, 259 (6th Cir. 1985).

-25-

context,[71] and it routinely follows the Restatement on issues regarding claim- and issue preclusion.[72]

This Court need not go so far as to say that its habeas decision binds the District as a matter of issue preclusion, since the decision constitutes *stare decisis* regardless of its issue-preclusive effect.[73] Rather, it need only hold that the D.C. courts' judgments are no longer binding on Singletary—a conclusion that follows from Restatement § 15 *a fortiori*.

## II.  The District is subject to liability under *Monell*.

Under *Monell*, a municipality may held liable under 42 U.S.C. § 1983 for unconstitutional action that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," but may not be held liable for their employees' constitutional torts based solely on a theory of *respondeat superior*.[74] As the Court explained in *Pembaur v. City of*

---

71.  *Auger v. D.C. Bd. of Appeals & Review*, 477 A.2d 196, 207 (D.C. 1984).

72.  *E.g.*, *Mitchell v. Gales*, 61 A.3d 678, 684 (D.C. 2013); *K.H. v. R.H.*, 935 A.2d 328, 334 (D.C. 2007); *Threatt v. Winston*, 907 A.2d 780, 784 (D.C. 2006); *Nuyen v. Luna*, 884 A.2d 650, 658 (D.C. 2005); *Shin v. Portals Confederation Corp.*, 728 A.2d 615, 620-25 (D.C. 1999); *Carr v. Rose*, 701 A.2d 1065, 1071-85 (D.C. 1997).

73.  The District was a defendant in Singletary's federal-court habeas action, but on appeal the United States Parole Commission was substituted for the District, as its successor. *Singletary v. Reilly*, 452 F.3d at 871 n.4.

74.  436 U.S. 658, 690-95 (1978).

-26-

*Cincinnati*, "[t]he 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."[75]

*Pembaur* further held that the notion of municipal "policy" encompasses more than just generally applicable rules that are adopted by a legislative body.[76] It extends to actions of nonlegislative officials and to actions "tailored to a particular situation and not intended to control decisions in later situations[,]" provided that the decision to take the action was "properly made by that government's authorized decisionmakers[.]"[77] That principle applies here: The District may be held liable for the revocation of Singletary's parole because the Board of Parole was the District's final policymaker regarding parole. And even apart from the Board's status as policymaker, the District's liability here is not based solely on *respondeat superior*.

---

75. 475 U.S. 469, 479 (1986).

76. *Id.* at 480-81.

77. *Id.* at 481. *See also*, *e.g.*, *McMillan v. Monroe County*, 520 U.S. 781, 784-86 (1997); *Maniaci v. Georgetown University*, 510 F. Supp. 2d 50, 65 (D.D.C. 2007); *Banks v. District of Columbia*, 377 F. Supp. 2d 85 (D.D.C. 2005).

### A. The Board of Parole was the District's final policymaker regarding parole.

### 1. The Board had full authority over parole revocation, and was not constrained by policies "not of its own making."

By statute, the Parole Board was granted power over the entire subject of

parole, including parole revocation:

> The Board shall:
>
> (1) Determine if and when it is in the best interest of society and the offender to release him or her on parole or on conditional release in the case of committed youth offenders;
>
> (2) Determine the terms and conditions of parole or conditional release;
>
> (3) Supervise parolees in the community; and
>
> (4) Determine if and when to terminate parole or conditional release or to modify the terms or conditions of parole or conditional release.[78]

Power to promulgate rules to implement and administer the parole laws was

granted by statute to the mayor, who delegated that authority to the chairman of the

---

78. D.C. Code § 24-201.2(a) (Repl. 1989), *redesignated as* D.C. Code § 24-401.02(a) (2001).

-28-

Parole Board.[79] The Board's regulations and guidelines had the force and effect of law.[80]

Although the mayor's authority was nominally delegated to the chairman rather than the Board as a whole, it is appropriate to regard the Board as the final policymaker. This conclusion follows from the combined effect of several factors.

*First*, the identity of the final policymaker for purposes of *Monell* is not conclusively determined by where rulemaking power is formally assigned. Policy-making authority can arise not only from positive law but as a result of custom and usage.[81] Furthermore, in his concurring opinion in *Prapotnik* (which was essential to the decision, since the lead opinion by Justice O'Connor was joined by only three other Justices), Justice Brennan said that "ultimately the factfinder must determine where such policymaking authority actually resides, and not simply where the applicable law purports to put it."[82]

---

79. D.C. Code § 24-201.03 (Repl. 1989), *redesignated as* D.C. Code § 24-401.03 (2001) (grant of rulemaking power to mayor); Mayor's Order 89-10 (Jan. 6, 1989), *in* 36 D.C. Reg. 1254 (Feb. 10, 1989) (delegation of rulemaking power by mayor).

80. *Cosgrove v. Thornburgh*, 703 F. Supp. 995, 1001-03 (D.D.C. 1988); *Teachey v. Carver*, 736 A.2d 998, 1004-06 (D.C. 1999).

81. *Jett v. Dallas Ind. School Dist.*, 491 U.S. 701, 737 (1989).

82. *Prapotnik*, 485 U.S. at 143 (Brennan, J., concurring in the judgment) (internal quotation marks and citation omitted). Justice Brennan's opinion was joined by Justices Marshall and Blackmun.

-29-

In this case, the regulation that the District points to as representing its relevant policy[83]—28 D.C.M.R. § 219 (1987)—was promulgated by the Board, not the chairman. Specifically, the regulation was promulgated in 1985, before the enactment of the statute authorizing the mayor to delegate rulemaking power to the chairman.[84] After that statute was enacted, and the mayor exercised his power of delegation, the 1985 regulations remained in effect without change.[85]

*Second*, what is important about the delegation of rulemaking power is not that the power was delegated to the chairman rather than to the Board as a whole, but that the power was internal to the Board rather than external. As explained in the plurality opinion in *City of St. Louis v. Prapotnik*, officials are not policy-makers if they are "constrained by policies not of [their own] making," but in doing so it was talking about officials who are subordinate to some higher authority:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than *the subordinate's* departures from them, are the act of the municipality. Similarly, when *a subordinate's* decision is subject to review by the municipality's authorized policymakers,

---

83.  D.C. Br. at 33.

84.  32 D.C. Reg. 1511, 1516-19 (March 15, 1985) (Addendum hereto at A26-A29). *See* D.C. Law 7-103, § 4, 34 D.C. Reg. 8279 (April 28, 1988) (copy to be provided with final brief).

85.  *Compare* 32 D.C. Reg. at 1516-19 (Addendum hereto at A26-A29) *with* 28 D.C.M.R. § 219 (1987) (Addendum at A21-A23).

they have retained the authority to measure the official's con-
duct for conformance with their policies. If the authorized
policymakers approve *a subordinate's* decision and the basis
for it, their ratification would be chargeable to the municipality
because their decision is final.[86]

Similarly, the Fifth Circuit has noted that for an action to be attributed to the

municipality, it "must be by a final decisionmaker who is also the policymaker,

unconstrained by policies *imposed from a higher authority*."[87]

The chairman of the Parole Board was in no sense an authority "higher" than

the Board or its individual members. The chairman had no power to direct the

other members in the performance of their duties or to control how particular cases

were decided. Other than the authority to make rules, the only special power given

to the chairman was the power to preside over the Board's meetings and to

"supervise the administrative and ministerial activities and personnel of the

---

86. 485 U.S. at 127 (1988) (plurality op.) (emphasis added and original emphasis
omitted). Although the statement quoted in the text is from a plurality opinion,
it is often cited as the governing rule. *E.g.*, *Valle v. City of Houston*, 613 F.3d
536, 543 (5th Cir. 2010); *Waters v. City of Chicago*, 580 F.3d 575, 582 (7th
Cir. 2009).

87. *Hampton Co. National Surety LLC v. Tunica County, Miss.*, 543 F.3d 221, 227
(5th Cir. 2008) (emphasis added).

-31-

Board."[88] Conspicuous by its absence is any authorization to supervise the Board's

substantive and discretionary activities and personnel.[89]

2. *The Board's status as final policymaker was not affected by the*
   *D.C. Council's power to disapprove regulations regarding parole.*

      The District argues that the rulemaking authority delegated by the mayor did

not constitute the power to make policy because regulations promulgated under

that delegation were subject to being disapproved by the D.C. Council. But that

argument (for which no authority is cited) proves too much. If the mere possibility

of a legislative override were decisive, nonlegislative officials could never qualify

as policymakers under *Monell* and there could be no such thing as the establish-

ment of municipal policy by custom. Yet it is beyond dispute that nonlegislative

officers *can* be policymakers and that policy *can* arise as a result of unofficial

custom.[90] Moreover, laws passed by the D.C. Council are subject to being

---

88. D.C. Code § 24-201.2(c) (Repl. 1989), *recodified as* D.C. Code § 24-
   401.02(c) (2001).

89. The chairperson was also required to "insure that all Board policies, plans,
   rules, and standards are coordinated with the Department of Corrections[.]"
   D.C. Code § 24-201.2(d) (Repl. 1989), *recodified as* D.C. Code § 24-
   401.02(d) (2001). That may explain why rulemaking power was delegated to
   the chairperson rather than the full Board.

90. *See, e.g.*, *Jett*, 491 U.S. at 737 (determination of who is final policymaker may
   be based on "custom and usage having the force of law" as well as on positive
   law) (internal quotation marks omitted); *Pembaur*, 475 U.S. at 480; *Monell*,
   436 U.S. at 690-91.

overridden by Congress, yet the District has never contended that as a result, Congress is its final policymaker.

The District relies on a provision of the D.C. Code that required any rules promulgated by the mayor regarding parole to be submitted to the Council for a 60-day review period.[91] But that provision did not require the Council's affirmative approval in order for the rules to take effect. Rather, it provided that if the Council did not approve or disapprove the rules in whole or in part during the review period, the rules would be deemed to be approved when that period expired. This process is analogous to the process for allowing a period for Congressional review before legislation passed by the D.C. Council takes effect.[92] As previously noted, the existence of the latter process has never been thought to mean that District's final policymaker is Congress.

3.   *The availability of habeas review is similarly irrelevant.*

The District contends that "revocation decisions are subject to meaningful review in habeas corpus," and that "[w]hen an official's decision is subject to meaningful review, that official cannot be said to be the final policymaker for

---

91.  D.C. Code § 24-201.3  (Repl. 1989), *redesignated as* D.C. Code § 24-401.3 (2001).

92.  D.C. Code § 1-206.02(c) (formerly § 1-233(c)).

municipal liability."[93] But as the Supreme Court made clear in *Prapotnik*, the focus with regard to reviewability is not on whether the challenged action was review-able in the abstract, but on whether it was subject to review by the actual policy-makers: "[W]hen a subordinate's decision is subject to review *by the municipality's authorized policymakers*, they have retained the authority to measure the official's conduct for conformance with their policies."[94]

The District sensibly does not suggest that courts exercising habeas juris-diction were the District's real policymakers regarding parole revocation. Rather, it contends that the policymaker was the Council (and it argued below in the alternative that the policymaker was the mayor). But Singletary had no right to seek review by the Council or the mayor.[95] Indeed, the District admitted that parole-revocation decisions were not subject to administrative or executive review of any kind.[96]

The availability of habeas review is also irrelevant because habeas corpus does not provide a vehicle for reviewing parole-revocation decisions on the

---

93.  D.C. Br. at 39.

94.  *Prapotnik*, 485 U.S. at 127 (plurality op.) (emphasis added and original emphasis omitted).

95.  *See* DE 35-3.

96.  DE 32-2 at ECF pp. 3-4.

-34-

merits.[97] It therefore does not constitute an effective remedy for purposes of *Monell*. Furthermore, a writ of habeas corpus could not possibly have *prevented* the Parole Board from revoking Singletary's review and sending him back to prison. Since habeas is available only if the petitioner is being unlawfully held in custody,[98] by definition it is not available until after the constitutional violation has occurred.

### 4.   The revocation of Singletary's parole did not violate District of Columbia policy.

Contrary to what the District contends, the revocation of Singletary's parole based on unreliable multiple hearsay did not violate any D.C. policy. Nothing in the regulations governing parole revocation addressed the issue of hearsay one way or another.[99] Although the regulations did give parolees the right to confront and cross examine adverse witnesses,[100] it did not prohibit such witnesses from offering hearsay (as occurred at Singletary's hearing). And while the regulations provided that a finding of a violation had to be based on a preponderance of the evidence,[101]

---

97.  *See, e.g.*, *Bennett v. Ridley*, 633 A.2d 824, 826 (D.C. 1993).

98.  28 U.S.C. § 2241(c)(3); D.C. Code §16-1906.

99.  *See* 28 D.C.M.R. § 219 (1987).

100. *Id.* § 219.1(b).

101. *Id.* § 219.6(e).

they did not require a demonstration of reliability in order for hearsay evidence to be considered.

5.  *The quasi-judicial nature of revocation decisions is irrelevant.*

In contending that quasi-judicial decisions "do not establish municipal policy,"[102] the District misunderstands the focus of the inquiry under *Monell*. The question is not whether the challenged action *established* municipal policy, but whether it *represents* municipal policy.[103] If Singletary's parole had been revoked for violating a D.C. statute that was unconstitutional on its face, the District could be held liable even though the revocation decision was quasi-judicial. Thus, the decision whether the municipality can be held liable in a particular case will generally turn on factors extrinsic to the underlying decision.

In some cases, municipal liability will arise because the action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers[]" or because it is based on a "governmental 'custom.'"[104] In other cases, the municipality can be held liable because the action—despite being "tailored to a particular situation and not intended to control decisions in later situations"—was taken by the municipality's

---

102. D.C. Br. at 48.

103. *Monell*, 436 U.S. at 694.

104. *Id.* at 690-91.

-36-

"authorized decisionmaker[.]"[105] The Supreme Court has never suggested that judicial or quasi-judicial actions are exempt from these principles.

## B.  The District has not been held liable on the basis of respondeat superior.

The purpose of *Monell*'s "policy or custom" requirement is to prevent municipalities from being held liable based solely on a theory of *respondeat superior.*[106] Even apart from the fact that the Board of Parole was the District's final policymaker regarding parole, Singletary's claim against the District is not based on *respondeat superior*.

*Respondeat superior* is a principle whereby an employer can be held liable for torts committed by its employees.[107] But the Board of Parole Board was not one of the District's employees. Our claim therefore is not based on "the existence of an employer-employee relationship with a tortfeasor,"[108] much less based *solely* on such a relationship.

Singletary's parole was revoked, not by an individual employee or even by the concerted action of multiple employees, but by the official action of one of the District of Columbia's executive agencies. The revocation was the result of a

---

105. *Pembaur*, 475 U.S at 481.

106. *Monell*, 436 U.S. at 690-95.

107. *See, e.g.*, Restatement (3d) of Agency § 2.04.

108. *Id.* at 692.

-37-

formal, on-the-record procedure required by the agency's own regulation. It resulted from an adjudication by officers who were appointed by the mayor with the advice and consent of the D.C. Council,[109] and it was effectuated by an order signed on behalf of the Board by its Chairman. Regardless of whether the Chairman is regarded as the decisionmaker,[110] her role in the process makes it clear that the revocation was the act of the Board acting as a distinct governmental body and exercising a uniquely governmental function—not merely the act of one or more individual employees.

None of the cases cited by the District presents a similar set of facts. For example, in *Polk County v. Dodson*,[111] the allegedly unconstitutional action was taken by an individual public defender, not by a multi-member adjudicative body. (Moreover, *Polk County* predates *Pembaur* and is therefore irrelevant to whether the District can be held liable on a theory that relies on *Pembaur*, as Singletary's does.)

Similarly, the challenged action in *Dick v. Watonwan County* had been taken by two individual social workers employed by the county's Human Services

---

109. D.C. Code § 24-201.1(a) (Repl. 1989), *redesignated as* D.C. Code § 24-401.01(a) (2001).

110. *Cf.* D.C. Br. at 38.

111. 454 U.S. 312 (1981).

Department.[112] And in *Bigford v. Taylor*, the action at issue had been taken by a sergeant and a deputy from the sheriff's office.[113] Those cases are therefore nothing like this one.

## C.  The District is not entitled to quasi-judicial immunity.

**1.** As part of its *Monell* argument, the District contends that it is entitled to the benefit of the absolute quasi-judicial immunity that protects individual members of the Board of Parole. That argument really has nothing to do with *Monell*; indeed, it is inconsistent with *Monell*, which specifically held that municipalities are not absolutely immune to suit under § 1983.[114] And case law subsequent to *Monell* confirms that the Board members' immunity is personal to them, and does not inure to the District's benefit.

In *Owen v. City of Independence*, the Supreme Court held that municipalities, unlike individual municipal officials, have no immunity from suit under § 1983.[115] Although *Owen* specifically addressed the defense of qualified immunity, its holding applies equally to absolute immunity. The Court explained that the immunities protecting individual officers had been "so firmly rooted in the

---

112. 738 F.2d 939, 941 (8th Cir. 1984).

113. *Bigford v. Taylor*, 834 F.2d 1213, 1215-16 (5th Cir. 1988).

114. 436 U.S. at 700, 702.

115. 445 U.S. 622 (1980).

common law and [that were] supported by such strong policy reasons" that if Congress had intended to abolish them it would have said so.[116] However, there was no comparable tradition of municipal immunity.[117] The Court also held that municipal immunity would be undesirable as a policy matter. If governmental bodies could assert the same immunities as their individual officers, the compensatory and deterrent purposes of § 1983 would often be defeated.[118] And the policy factors underlying the immunity defenses—protecting individual officials and employees from personal liability—do not apply when the defendant is the government itself.[119]

The fact that municipalities are not immune from suit under § 1983 is confirmed by the Supreme Court's subsequent decisions. In *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, the Court cited *Owen* (as well as *Monell*) for the proposition that "unlike government officials, municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983."[120] The

---

116. 445 U.S. at 637; *see id.* at 637–68.

117. *Id.* at 638-50.

118. *Id.* at 650-52.

119. *Id.*. at 654–56.

120. 507 U.S. 163, 166 (1993).

-40-

Supreme Court made the same point in *Kentucky v. Graham*.[121] It stated there that in official-capacity suits (which the Court noted are in substance suits against the governmental entity itself), "personal immunity defenses" are unavailable.[122] In such actions, "[t]he only immunities that can be claimed are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."[123]

Even before *Graham* and *Leatherman*, this Court had recognized that municipalities are not entitled to immunity. In *Haynesworth v. Miller*, the Court held that the District of Columbia may be sued under § 1983 for unconstitutional prosecutions and that it may not defend against such a suit by asserting prosecutorial immunity.[124] In reaching this conclusion, the Court read *Owen* broadly as indicating that "[f]or the purpose of affixing liability on a municipality, it is irrelevant that the decisionmaker enjoys personal immunity for the behavior under

---

121. 473 U.S. 159 (1985).

122. *Id.* at 165-67.

123. *Id.* at 167.

124. 829 F.2d 1245, 1271–74 (D.C. Cir. 1987), *abrogated in part on other grounds*, *Hartman v. Moore*, 547 U.S. 250 (2006).

attack."[125] *Haynesworth* further held that this is true even when the official is protected by absolute immunity.[126]

This rule that municipalities are not protected by their officials' absolute immunity applies to judicial (and quasi-judicial immunity).[127]

**2.** The District admits that it would not be immune from suit "if it had an affirmative policy that the Board of Parole should revoke parole based on unreliable hearsay."[128] But it argues that it should be protected here by the Board members' absolute immunity because Singletary's claim is, it contends, "essentially one of vicarious liability for Board members' decisions[.]"[129] According to the District, denying it such immunity would allow Singletary "to end-run judicial immunity[.]"[130]

---

125. 829 F.2d at 1272 n. 227.

126. *Id.*

127. *Hernandez v. Sheahan*, 455 F.3d 772, 776 (7th Cir. 2006); *Wilson v. Marshall Indep. Sch. Dist.*, No. 2:09-CV-273-DF-CE, 2011 U.S. Dist. LEXIS 40598, at *7-8 (E.D. Tex. Feb. 1, 2011); *Teed v. Hilltown Twp.*, No. 03-cv-6040, 2004 U.S. Dist. LEXIS 9477, at *23-24 (E.D. Pa. May 20, 2004); *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, No. 99-152, 1999 U.S. Dist. LEXIS 15846, at *12-13 (E.D. La. Oct. 8, 1999).

128. D.C. Br. at 42.

129. *Id.*

130. *Id.* at 43.

This argument is foreclosed by the cases discussed above, and even if that were not the case, the argument would fail. To begin with, the argument rests on the assumption that the District's liability here is based on vicarious liability. But as we have shown, that assumption is wrong. The conclusion that Singletary's claim is consistent with *Monell* necessarily means that the District's liability is not vicarious.

Beyond that, the District is off base in its argument that judges will be inhibited in their decisionmaking by the possibility of the government being held liable for their actions. *Owen* specifically rejected the claim that the risk of *governmental* liability will inappropriately influence the actions of individual decisionmakers.[131]

Although the District cites a number of state-court cases taking a different view with regard to state-law immunities, those decisions are irrelevant. This Court must follow *Owen*, not only because defenses to federal-law claims are governed by federal law, but also because *Owen* deals with the issue in the specific context of § 1983.

Even apart from what we have already said, granting the District immunity here is not necessary to protect the parole-revocation process. Under *Heck v. Humphrey*, a plaintiff cannot sue for damages due to the unconstitutional

---

131. *Owen*, 445 U.S. at 655-56 (emphasis in the original; footnote deleted).

revocation of his parole unless the revocation "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."[132] The possibility that a parolee whose parole was revoked will obtain habeas relief exists in every revocation case, whether or not the government is immune from suit. To the extent that the decisionmaker is influenced by that possibility, the influence is entirely benign. There is no reason to think that the

---

132. 512 U.S. 477, 486-87 (1994). *Heck* held—

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment … a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

> 512 U.S. at 486-87 (footnote and citation omitted).

Both the Supreme Court and this Court have acted on the assumption that *Heck* applies to suits seeking damages for the unconstitutional revocation of parole, *Spencer v. Kemna*, 523 U.S. 1, 17 (1998); *Anyanwutaku v. Moore*, 151 F.3d 1053, 1055-57 (Cir. 1998). (This Court has issued a number of unpublished decisions relevant to this issue, but the Court's rules prohibit citing them because they were decided before 2002. *See* Circuit Rule 32.1(b)(1)(A). The citations will be provided upon request.)

At least three circuits have issued reported decisions applying *Heck* to parole revocation. *White v. Gittens*, 121 F.3d 803, 806-807 (1st Cir. 1997); *Crow v. Penry*, 102 F.3d 1086, 1087 (10th Cir. 1996); *Littles v. Bd. of Pardons & Paroles Div.*, 68 F.3d 122, 123 (5th Cir. 1995).

possibility of municipal liability following habeas relief will have any incremental effect on the decisionmaker.

**3.** The District relies primarily on state-court cases decided under state law, which are therefore inapposite. So, too, are most of the federal-court cases the District cites.

Two of the cases—*Austin Municipal Securities, Inc. v. National Association of Securities Dealers*[133] and *Cooper v. City of Ashland*[134]—did not involve § 1983 and therefore say nothing about immunity from § 1983 suits. In fact, the court in *Austin Municipal Securities* specifically rejected the argument that it should be guided by case law under § 1983, noting that actions by the defendant, the National Association of Securities Dealers, "are more akin to those of the SEC, which has sovereign immunity from damages suits, than to municipal activities."[135] And the cited portion of *Cooper* dealt with a constitutional-tort claim against the United States and a federal district court;[136] § 1983 does not apply to such claims.[137] More-

---

133. 757 F.2d 676 (5th Cir. 1985).

134. 187 F.3d 646 (table), *reported in full*, 1999 U.S. App. LEXIS 14082 (9th Cir. June 22, 1999).

135. 757 F.2d at 692 (citation omitted).

136. 1999 U.S. App. LEXIS 14082 at *8-10.

137. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1104 (D.C. Cir. 2005) ("Section 1983 does not apply to federal officials acting under color of federal law.")

over, it is unclear why *Cooper* discussed judicial immunity at all, since damages claims against the United States for constitutional torts are independently barred by sovereign immunity.[138]

Although *Kalina v. Fletcher*[139] and *Imbler v. Pachtman*[140] did involve claims under § 1983, they dealt only with the immunity of individual officials, and say nothing about municipal liability. The District cites these cases for the proposition that prosecutorial immunity exists to protect the judicial system, not just individual prosecutors.[141] That is true but irrelevant; permitting municipal liability here will do nothing to harm either the judicial process or the quasi-judicial parole revocation process.

*Shebeshi v. United States*[142] is the case cited by the District that comes closest to being relevant, since it involved a claim against the District of Columbia. *Shebeshi* is a district court decision and therefore does not bind this Court. And in any event it is inapposite. The claim against the District was not brought under § 1983; the plaintiff's claims were based on the common law and on various

---

138. *FDIC v. Meyer*, 510 U.S. 471, 475-78 (1994).

139. 522 U.S. 118 (1997).

140. 424 U.S. 409 (1976).

141. D.C. Br. at 57.

142. No. 12-356-JEB, 2013 U.S. Dist. LEXIS 4518 (D.D.C. Jan. 11, 2013).

-46-

provisions of international law and therefore were not actionable under § 1983, which applies only to violations of the Constitution or federal law.[143] And although the court did hold that the District was entitled to judicial immunity, none of the issues we have discussed were briefed or addressed by the court.[144]

## III. Singletary's parole was revoked without due process.

### A.  *This Court has already held that Singletary was denied due process.*

The District argues that this Court's decision granting Singletary's habeas petition was not based on the conclusion that Singletary had been denied due process. That argument was rejected by two judges of the district court—Judge Kollar-Kotelly, in her decision denying the District's motion to dismiss, and Judge Jackson in her decisions on the cross-motions for summary judgment and on the District's subsequent motion for reconsideration.[145] Indeed, Judge Jackson said that the District argument on this point could not be squared "with even a cursory reading of the D.C. Circuit's opinion[.]"[146] These decisions were correct.

---

143. 2013 U.S. Dist. Lexis 4518 at *2-3.

144. *See* Pl. Opp. to D.C. Mtn. to Dismiss, *Shebeshi v. United States*, No. 12-356-JEB (D.D.C. filed Jan. 9, 2013) (DE 44) (link).

145. DE 41 at 2-4 & n.2; DE 49 at 2-3.

146. DE 41 at 4 n.2.

In the habeas decision, this Court began its analysis by citing and quoting *Morrissey v. Brewer* [147] and *Gagnon v. Scarpelli* [148]—decisions concerning the due-process rights that must be afforded in revoking parole—as the controlling precedents.[149] It stated, "Parole revocation violates due process if the decision is 'either totally lacking in evidentiary support or…so irrational as to be fundamentally unfair.'"[150] The court then went on to hold that Singletary's revocation hearing had not satisfied this due-process standard: "We find that the hearsay presented at the hearing was not demonstrated to be reliable and that the Board's decision to revoke Singletary's parole was therefore 'totally lacking in evidentiary support.'"[151] And later in the opinion, the court expressly held that Singletary's right to due process had been violated: "[T]he government has not established that the hearsay deemed adequate by the Board was 'sufficient in … reliability to ensure fundamental due process rights.'"[152]

---

147. 408 U.S. 471 (1972).

148. 411 U.S. 778 (1973).

149. *Singletary v. Reilly*, 452 F.3d at 871-72.

150. *Id.* at 872 (quoting *Crawford v. Jackson*, 323 F.3d 123, 128 (D.C. Cir. 2003)) (ellipsis in the original).

151. *Id.* at 873 (quoting *Crawford*, 323 F.3d at 129).

152. *Id.* at 874 (quoting *Crawford*, 323 F.3d at 128).

-48-

The District does not explain what this Court could have meant in saying that the revocation decision was insufficiently reliable "to ensure fundamental due process rights[,]" if not that Singletary was denied due process. Moreover, the District's argument is refuted by a simple syllogism drawn from the Court's opinion:

| | |
|---|---|
| Major premise: | "Parole revocation violates due process *if the decision is '… totally lacking in evidentiary support….'*"[153] |
| Minor premise: | "We find that the hearsay presented at the hearing was not demonstrated to be reliable and that the Board's decision to revoke Singletary's parole *was therefore 'totally lacking in evidentiary support.'*"[154] |
| Conclusion: | Singletary's parole was revoked without due process. |

The District also does not explain what legal basis this Court acted on, if not that Singletary had been denied due process. The grounds on which a federal court may issue a writ of habeas corpus are specified in 28 U.S.C. § 2241(c); the only such ground that could possibly apply in this case was § 2241(c)(3), which authorizes the issuance of the writ if the petitioner " is in custody in violation of the Constitution or laws or treaties of the United States[.]" And the only provision

---

153. *Id.* at 872 (quoting *Crawford*, 323 F.3d at 128) (emphasis added).

154. *Id.* at 873 (quoting *Crawford*, 323 F.3d at 129) (emphasis added).

of federal law that Singletary's confinement could possibly have violated was the

Fifth Amendment's Due Process clause.

It is true, as the District says, that this Court ordered that Singletary be given

a new revocation hearing, but did not order his release pending that hearing. But

that does not support the District's contention that the Court did not hold that

Singletary had been denied due process. Rather, what it indicates is that the remedy

granted by the Court was not entirely appropriate: In addition to ordering a new

hearing, the Court should have directed that Singletary be released if such a

hearing was not held within a reasonable time (or within some specified time).[155]

However, that minor error pales in significance compared to the error that the

District imputes to the Court by denying that its decision was based on the due-

process clause. For if the Court did not conclude that Singletary had been denied

due process, its decision granting his habeas petition was entirely unjustified.

### B. The habeas proceedings and the new revocation hearing did not provide the process that was due.

This Court's decision that Singletary was denied due process necessarily

means that he did not receive all the process that was due. But even if that were not

the case, the District's argument on this point would still fail. The District has cited

no authority for the proposition that a due-process violation is avoided by the

---

155. *See* 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 33.3 (6th ed. 2011).

availability of habeas relief and the granting of a new hearing ten years after the fact. That is not surprising, because the proposition is unfounded.

**1.** Due process generally requires a hearing *before* a person is deprived of his liberty.[156] Although there are circumstances in which due process will be satisfied by a post-deprivation hearing, that hearing must nevertheless take place before the deprivation becomes final.[157] Here the deprivation of liberty became final when the Board of Parole issued its order revoking his parole. That was therefore the point at which Singletary's due-process rights were violated.

That conclusion is not changed by the fact that Singletary was able to seek (and was eventually granted) a writ of habeas corpus, because such after-the-fact relief cannot perform the function of the hearing that due process requires.

The constitutional requirements for revoking parole are set out in *Morrissey v. Brewer*.[158] Under *Morrissey*, an inquiry in the nature of a preliminary hearing be conducted by an impartial decisionmaker soon after the parolee is arrested, to determine whether there is probable cause or reasonable ground to believe that the

---

156. *E.g.*, *Zinermon v. Burch*, 494 U.S. 113, 127-28 (1990).

157. *See, e.g.*, *Parratt v. Taylor*, 451 U.S. 527, 540 (1981); *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991).

158. 408 U.S. 471 (1972).

parolee has violated his parole conditions.[159] Subsequently, an evidentiary hearing must, if desired by the parolee, be held "prior to the final decision on revocation by the parole authority."[160] This hearing "must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested relevant facts[.]"[161] The hearing must therefore be "structured to assure that the finding of a parole violation will be based on verified facts, and that the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior."[162]

A habeas petition cannot perform those functions. Habeas does not provide a vehicle for reviewing parole-revocation decisions on the merits.[163] In particular, the court does not decide the underlying issue of whether the petitioner violated his conditions of parole. It focuses instead on whether he received a fair hearing. So even if the habeas petition is granted, the court does not acquit the petitioner of the charges against him and restore his parole. Rather, it rules (as this Court did

---

159. 408 U.S. at 485-87.

160. *Id*. at 487-88.

161. *Id.* at 488.

162. *Id.* at 484. As the District notes, there can be a "substantial time lag" between the preliminary hearing and the final hearing. (D.C. Br. at 52). But that does not mean that it was constitutional to imprison Singletary based on a final revocation hearing that did not provide due process.

163. *See, e.g.*, *Bennett v. Ridley*, 633 A.2d 824, 826 (D.C. 1993).

here[164]) that the petitioner is entitled to a new hearing by the appropriate parole officials.

**2.** The only situations in which the Supreme Court has held that due process can be satisfied by a judicial remedy that is available after a final deprivation are those in which the government needs to act quickly to protect the public (which was not the case here, since Singletary was in detention pending his revocation hearing) or in which a pre-deprivation hearing would otherwise be impracticable, such as where the deprivation is caused by a "random and unauthorized" action by a government employee.[165] It is the latter principle that the District seeks to invoke by its citation of *Hudson v. Palmer*.[166] But the principle is inapposite.

The reason that a predeprivation hearing is not required in cases involving random and unauthorized acts is that in such cases the government is unable to provide a predeprivation hearing because it cannot know in advance where or when a deprivation might occur.[167] This exception to the general requirement of a predeprivation hearing extends only to cases to which this rationale applies. Thus,

---

164. 452 F.3d at 493, 499.

165. *Zinermon*, 494 U.S. at 128-29; *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt*, 451 U.S. at 538-42 (1984).

166. 468 U.S. 517 (1984) (cited in D.C. Br. at 51).

167. *See Zinermon*, 494 U.S. at 128-29; *Hudson*, 468 U.S. at 533; *Parratt*, 451 U.S. at 541.

the exception does not apply to deprivations that result from an "established state procedure[,]" for in such cases a predeprivation hearing *is* practicable.[168]

It is clear beyond doubt that Singletary's parole was revoked pursuant to an "established [government] procedure" as opposed to an action that was "random and unauthorized." Procedures governing parole revocation were spelled out in the Board of Parole's regulations,[169] a formal revocation hearing was held, the revocation was effectuated by a written order of the Board,[170] and the Board had statutory authority to revoke parole.[171] The fact that a hearing was held before the revocation confirms that a pre-revocation hearing was practicable.

Note that the question here is whether it was predictable that Singletary's parole-revocation hearing could result in the revocation of his parole, not whether it was predictable that the Board would base its decision solely on unreliable evidence. As the Supreme Court explained in *Hudson v. Palmer*, "The controlling inquiry is solely whether the state is in a position to provide for predeprivation

---

168. *See Zinerman*, 494 U.S. at 130; *Hudson*, 468 U.S. at 532 & n.13; *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435-36 (1982); *Parratt*, 451 U.S. at 541.

169. 28 D.C.M.R. §§ 217-220 (1987).

170. DE 46-4.

171. D.C. Code §§ 24-201.2(a)(4), 24-206 (1989 Repl.), *redesignated as* §§ 24-401(a)(4), 24-406 (2001).

process."[172] And that point was reiterated and reinforced in *Zinermon v. Burch*, where the Court held that the deprivation of the plaintiff's liberty was neither random nor unauthorized;[173] the reason it was not random was that "[a]ny erroneous deprivation will occur, if at all, at a specific, predictable point in the…process,"[174] and the reason it was not unauthorized was that the government decisionmakers had been delegated both "the power to effect the very deprivation complained of here" and the duty to "initiate the procedural safeguards set up by state law to guard against unlawful confinement."[175]

Here, the District was "in a position to provide for [pre-final-deprivation] process," as shown by the fact that such a hearing was held. As in *Zinermon*, the erroneous deprivation here occurred "at a specific, predictable point in the… process"—namely, when the Board issued its decision after the revocation hearing. And as in *Zinermon*, the Board had both the delegated power to revoke Singletary's parole and the duty to provide him with the required procedures.

---

172. 468 U.S. at 534.

173. 494 U.S. at 135-39.

174. *Id.* at 136; *see id.* at 135-38.

175. *Id.* at 138-39.

## IV. The exclusion of evidence about the Houtman murder was appropriate.

A plaintiff who establishes that his right to due process was violated is entitled to compensatory damages for any harm that was proximately caused by the violation.[176] But once a due-process violation has been shown, the plaintiff need not prove that the government would not have taken the same action against him if it had afforded him due process. Rather, the burden shifts to the defendant to show that providing due process would *not* have changed the result.[177]

Carrying that burden in this case would have required the District to in effect retry the Houtman murder and prove that Singletary was involved in it. Although the District was not permitted to present such evidence at trial, that does not mean that it was denied a fair opportunity to defend against Singletary's claim. As shown below, the issue of causation was squarely raised by Singletary's motion for summary judgment on liability, but the District ignored the issue. The causation issue was consequently resolved in Singletary's favor on summary judgment. And even apart from that, the District forfeited the right to offer evidence regarding causation because it failed to properly raise the issue.

---

176. *See, e.g., Carey v. Piphus*, 435 U.S. 247, 254-59 (1978); *McClure v. Independent School Dist. No. 16*, 228 F.3d 1205, 1213 (10th Cir. 2000).

177. *See, e.g., Carey*, 435 U.S. at 260; *McClure*, 228 F.3d at 1213; *Brewer v. Chauvin*, 938 F.3d 860, 864-65 (8th Cir. 1991); *Franklin v. Aycock*, 795 F.2d 1253, 1263-64 (6th Cir. 1986).

**A.  *The question whether Singletary's parole would have been revoked had he received due process was resolved on summary judgment.***

**1.** As described in more detail in our counterstatement of facts, Singletary's motion for summary judgment as to liability raised the issue of causation, arguing (1) that the District could avoid liability by showing that Singletary's parole would have been revoked even if he had received due process, (2) that the District could not carry that burden, and (3) that Singletary was therefore entitled to summary judgment on the issue.[178] In opposing Singletary's motion, the District ignored this argument.

The District did not contest Singletary's argument that, assuming a due-process violation was shown, the burden was on the District to show that if Singletary had received due process, his parole would still have been revoked.[179] And it made no effort to carry that burden. It presented no evidence tending to show that Singletary's parole would still have been revoked if he had received due process. Nor did the District dispute the statement in Singletary's declaration that he had not killed Houtman or participated in the murder.[180] Under the district

---

178. DE 32 at 18-19

179. *See* DE 34.

180. DE 34 at 17.

court's local rules, that amounted to an admission that Singletary had not been involved.[181]

Thus, the district court correctly regarded its grant of summary judgment on liability as having resolved the question whether Singletary's parole would have been revoked if he had been afforded due process. While the summary-judgment decision did not discuss the causation issue, that is hardly surprising given that the issue was not contested. And because the issue of causation had already been resolved, the exclusion of evidence on the issue was absolutely appropriate.

**2.** The District argued in its new-trial motion that its evidence was admissible, on the theory that the question whether Singletary would have lost his liberty even if he had received due process goes to the issue of damages rather than liability.[182] Although some cases do treat the question that way,[183] that is irrelevant. What is important here is not how the issue should be characterized in an abstract philosophical sense, but how it should be characterized as a practical matter in the procedural context of this case. And it is clear beyond doubt that the district court

---

181. D.D.C. LCvR 7(h)(1) ("In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").

182. DE 73 at ECF pp. 19-22.

183. *But cf. Franklin*, 795 F.2d at 1263 (distinguishing the issue of causation—defined the same way that we define it—from that of damages).

regarded the issue as going to liability. In its decision denying the District's motion for a new trial, the court described Singletary's summary-judgment motion as having "demonstrated [the] correct understanding that the causation issue related to liability[.]"[184]

The District also argued below that Singletary had "acknowledged that whether the deprivation of Singletary's liberty was justified was an issue of damages."[185] But that was not Singletary's position. The District relied on this statement from Singletary's opening memorandum regarding summary judgment (emphasis by the District): "In a due-process case such as this one, the defendant may ordinarily defend against *damages* liability by showing that it would have reached the same decision even if it had not violated the plaintiff's [right to] due process …."[186] This might be described as argument-by-italicization, and it is easily rebutted simply by changing the typography: "In a due-process case such as this one, the defendant may ordinarily defend against damages *liability* by showing…."

---

184. DE 82 at 11.

185. DE 76 at 17.

186. D.C. Memo. 17.

**B. The District forfeited the right to argue that Singletary's parole would have been revoked even if he had received due process.**

Even apart from the fact that the causation issue was decided on summary judgment, evidence concerning that issue was properly excluded because of the District's multiple procedural defaults. As the district court noted in granting Singletary's motion in limine, the District did not raise the argument that Singletary's parole would have been revoked even if he had been afforded due process until "an opposition…filed on a Friday night before a Tuesday trial."[187] Although the issue was one on which the District had the burden of proof,[188] it was not raised in the District's answer or as one of the 22 defenses the District listed in the pretrial statement.[189] Nor had the District proposed any jury instructions dealing with the issue.[190]

Given the District's delay in raising its no-causation argument, the decision excluding the evidence was well within the district court's discretion. The District did not contend that its procedural defaults were the result of excusable neglect. And permitting the evidence to be offered would have unfairly prejudiced Single-

---

187. DE 63 at 5.

188. See cases cited in note 177, above.

189. DE 54 at 6-8; DE 58 at 5-7.

190. DE54 at 33-34; DE 58 at 33-34.

tary, since his counsel had prepared for trial on the reasonable assumption that the circumstances of Houtman's murder would not be in issue.

## V. The other evidentiary rulings were within district court's discretion.

### A. The court properly excluded evidence offered for the purpose of showing that if Singletary's parole had not been revoked, he might have violated his terms of parole and been reincarcerated.

The District contends that the district court erred in excluding the evidence by which the District hoped to prove that if Singletary's parole had not been revoked, he would have re-offended and been sent back to prison. This argument has not been adequately preserved for review, because it is not included in the District's list of questions presented.[191] And in any event, the district court's action was entirely appropriate.

The District's very purpose in offering the evidence was improper: it wanted to have the jury speculate about what would have happened in some alternate universe in which Singletary's parole was not revoked. Evidence inviting such speculation is inadmissible under Fed. R. Ev. 403.[192]

---

191. *See* Fed. R. App. P. 28(a)(5).

192. *United States v. Martin*, 618 F.3d 705, 729 (7th Cir. 2010); *United States v. Lighty*, 616 F.3d 321, 358-59 (4th Cir. 2010); *United States v. Lucas*, 499 F.3d 769, 782 (8th Cir. 2007).

Moreover, the speculation would have been based on a chain of inference that was itself impermissible. Starting from the premise that Singletary had supposedly committed certain specific bad acts, the District would have asked the jury to infer that he had a propensity to commit bad acts, and would have acted on that propensity sooner or later if he had remained out on parole. While Fed. R. Ev. 404 might not apply directly, since it excludes character and other-bad-act evidence when offered to show that a person acted in accordance with a character trait "on a particular occasion[,]"[193] it does establish the general principle that propensity evidence is strongly disfavored.

Contrary to what the District contends, this is not a case in which "possession of a particular character trait is an operative fact in determining legal rights and liabilities of the parties."[194] What the District is actually referring to here—but fails to cite—is Fed. R. Ev. 405(b), which permits a person's character or character trait to be proved by specific instances of his conduct when the person's character or character trait "is an essential element of a charge, claim, or defense[.]" In this case, Singletary's alleged propensity to commit crimes is not an essential element of any charge, claim, or defense.

---

193. Fed. R. Ev. 404(a)(1), -(b)(1).

194. D.C. Br. at 55.

**B.   *Any objections to the other rulings are forfeited.***

**1.** The District complains about rulings that supposedly "allowed the jury to consider a one-sided version of Singletary's blindness and his resulting discomfort in prison" and that "excluded the District's attempt to show that Singletary received a speeding ticket and that his vision was not as significant a handicap as he claimed."[195] However, the District does not explain why it thinks those rulings were incorrect and cites no authority to support its position. Nor are the issues mentioned in the District's statement of the questions presented. Because of those omissions, the District's objections to these rulings have been waived.

An appellant's brief must contain a statement of the issues presented for review and must set out "appellant's contentions *and the reasons for them, with citations to the authorities … on which the appellant relies*[.]"[196] And these requirements are enforced.[197] The Court has held repeatedly that it will not address arguments that are "asserted but unanalyzed[,]" because "appellate courts do not sit

---

195. D.C. Br. at 55-56 n.9.

196. Fed. R. App. P. 28(a)(5), -(9)(A) (emphasis added).

197. *E.g.*, *Laurel Bay Health & Rehab. Ctr. v. NLRB*, 666 F.3d 1365, 1367 n.2 (D.C. Cir. 2012); *United States v. Baugham*, 449 F.3d 167, 178 & n.3 (D.C. Cir. 2006).

as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."[198]

**2.** A number of additional rulings are referred to in the District's statement of facts but not mentioned in its statement of the questions presented or in the "Argument" section of its brief. As a result, any objection to those rulings has been waived.

## Conclusion

The judgment below should be affirmed.

Respectfully submitted,

/s/ *Neal Goldfarb*
Neal Goldfarb

| | |
|---|---|
| Stephen C. Leckar | Butzel Long Tighe Patton, PLLC |
| Law Office of Stephen Leckar | 1747 Pennsylvania Ave., NW, Suite 300 |
| 1850 M St., NW, Suite 240 | |
| Washington, DC 20036 | Washington, D.C. 20006 |
| (202) 742-4242 | (202) 454-2826 |
| steve@leckarlaw.com | ngoldfarb@bltplaw.com |
| | |
| Edward Sussman | Steven R. Kiersh |
| 601 Pennsylvania Ave., NW | 5335 Wisconsin Ave., N.W. |
| Suite 900-South Building | Suite 440 |
| Washington, D.C. 20004 | Washington, D.C. 20015 |
| (202) 737-7110 | (202) 347-0200 |
| edwardsussman@yahoo.com | skiersh@aol.com |

*Counsel for Plaintiff Charles Singletary*

---

198. *Duncan's Point Lot Owners Ass'n v. FERC*, 522 F.3d 371, 377 (D.C. Cir. 2008) (internal quotation marks and citations omitted).

## Certificate of Compliance

I HEREBY CERTIFY that this brief complies with the type-limitation in Fed. R. App. P. 32(a)(7)(B) because it contains 14,000 words, excluding those portions allowed to be exempted. The brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and -(6) because it has been prepared in a proportionally-spaced typeface (Times New Roman, 14 points) using Microsoft Word 2010.

/s/ *Neal Goldfarb*
Neal Goldfarb

**Certificate of Service**

I HEREBY CERTIFY that on this 7th day of June, 2013, the foregoing brief

served on the following via the Court's ECF system:

>Mary L. Wilson, Esq.
>Senior Assistant Attorney General
>Office of the Attorney General
>441 4th Street, N.W., Suite 600S
>Washington, D.C. 20001
>mary.wilson@dc.gov

>/s/ *Neal Goldfarb*
>Neal Goldfarb

# Addendum

Parole Board regulations (28 D.C.M.R. §§ 100–2230) ...........................................A1

D.C. Board of Parole, Notice of Final Rulemaking, 32 D.C. Reg. 1511
(March 15, 1985) (excerpts) ................................................................................A25

Mayor's Order 89-10, 36 D.C. Reg. 1254 (Feb. 10, 1989) ..................................A30

## CHAPTER 1     BOARD OF PAROLE

**100     AUTHORITY AND FUNCTIONS OF THE BOARD OF PAROLE**

100.1   The Board of Parole (also referred to in chapters 1 through 4 of this title as "the Board"), as established under D.C. Code, §24-201(a), 1981 ed., shall exercise its authority in accordance with the provisions of Commissioner's Order No. 67-95, issued December 26, 1967 (Organization Order No. 6), as amended; D.C. Code, 24-201 et seq., and Title 18 of the U.S. Code, §§4161 through 4209 and §§5001 through 5026.

100.2   The Board shall have sole authority to grant parole, or in the case of a committed youth offender grant conditional release, modify the terms or conditions of parole, and determine if and when to terminate parole for all prisoners serving a sentence of six (6) months or more or committed under the provisions of the Youth Corrections Act, if confined in a correctional institution or facility of the District of Columbia.

100.3   The Board shall be responsible, in collaboration with the Department of Corrections, for establishing standards of supervision.

100.4   The Board shall have sole authority to issue warrants for violation of parole or mandatory release.

100.5   The Board shall have sole authority to determine the date of eligibility for parole in any case where the committing court specifies such eligibility shall be established by the Board of Parole in accordance with 18 USC 4208(a)(2), 18 USC 922, 924, or 26 USC 5871.

100.6   The Board shall have sole authority to release parolees or mandatory releasees from supervision prior to the expiration of the maximum terms for which they were sentenced.

100.7   The Board shall have sole authority to discharge committed youth offenders conditionallly from active supervision or unconditionally, in its discretion, after one year of supervision, thereby setting aside the conviction and directing expunging of the record, pursuant to the Youth Corrections Act.

100.8   The Board shall be responsible for recommending to the courts where applicable, a reduction in minimum sentence.

A1

**100     AUTHORITY AND FUNCTIONS OF THE BOARD OF PAROLE**     (Continued)

100.9    The Board shall be responsible for reporting to the committing court within sixty (60) days, findings and a recommendation for action on cases committed for observation and study under the Youth Corrections Act (18 USC 5010(e)).

100.10   The Board shall be responsible for consulting with and making recommendations to the Director of the Department of Corrections as to the general treatment, training and correctional policies for committed youth offenders pursuant to the Youth Corrections Act.

100.11   The Board shall conduct all initial and review hearings for all committed youth offenders.


**101     CONFIDENTIALITY OF PAROLE RECORDS**

101.1    To protect the committed offender released on parole against any unwarranted publicity or invasion of privacy which may prove deleterious to his or her adjustment, the principles set forth in this section relative to parole records shall be observed by the Board.

101.2    The dates of sentence and commitment, parole eligibility date, regularly scheduled mandatory release date, or expiration date of sentence, shall be revealed in individual cases upon proper inquiry by any party having a bonafide interest.

101.3    In its discretion, where public interest is deemed to require it, the Board may reveal whether or not the inmate is being considered for parole or has been granted or denied parole, and if granted, what the effective release date is, or if denied, when the case will be reconsidered.

101.4    Other matters contained in parole records may be revealed at the Board's discretion only in exceptional cases.


**102     APPLICATION FOR PAROLE**

102.1    Except in the case of offenders committed under the Youth Corrections Act, each prisoner, upon approaching eligibility for parole consideration, shall be asked by Department of Corrections personnel to execute a form either applying for or declining consideration for parole.

102.2    If an individual declines to execute the form indicating application for or waiver of consideration, that person shall be scheduled to appear before the Board or its designated examiner, for purposes of being advised as to his or her eligibility rights under the statute.

A2

## 102   APPLICATION FOR PAROLE   (Continued)

102.3   An individual who has filed a waiver shall have the option of submitting an application at a later date.

102.4   In those cases where an individual has been committed under the provisions of 18 USC 4208(a)(2) and 18 USC 922, 924 or 26 USC 5871, making the Board responsible for the establishment of the parole eligibility date, sixty (60) days after commitment and upon completion of a classification study, the individual shall be permitted to file an application to appear before the Board for an initial hearing for purposes of setting a parole eligibility date.

## 103   HEARINGS BEFORE THE BOARD

103.1   Each individual eligible for parole consideration shall appear in person for a hearing before the Board, a member of the Board, or an examiner.

103.2   Each person appearing at a parole hearing shall not be accompanied by counsel nor any relative, friend, or other outside person.

103.3   Hearings shall not be open to the public.

103.4   Attorneys, family members, relatives, friends, or other interested persons desiring to submit information pertinent to any case may do so by forwarding letters or memoranda to the offices of the Board. These persons may also make arrangements to appear at Board headquarters in person to discuss any case in which they have an interest.

103.5   All records and transcripts of parole hearings shall be confidential and shall not be available or open to the prisoner, the prisoner's attorney or family, or any other unauthorized person.

103.6   Regular hearings shall be scheduled for each Department of Corrections institution. These hearings shall ordinarily be held during regular working hours of the institutions, Monday through Friday, exclusive of holidays.

103.7   The Board may schedule special hearing dates at these institutions as it deems necessary.

103.8   The Board may conduct parole hearings in its D.C. headquarters from time to time. The same procedures governing institutional parole hearings shall be followed for all hearings held at the Board's offices.

A3

103.1    A prisoner serving a maximum sentence of less than five (5) years who was denied parole at his or her original parole hearing ordinarily shall be granted a rehearing no later than six (6) months after the Board's last action.

103.2    A prisoner serving a maximum sentence of five (5) years or more who was denied parole at the original hearing ordinarily shall receive a rehearing one (1) year after the last action taken by the Board.

103.3    Rehearings shall be afforded to parole and mandatory release violators whose status was revoked by Board action. In considering where in a range to order a rehearing scheduled, the Board may consider mitigating and aggravating factors of the violations, which may include the nature of a new offense (property crime, crime of violence against person, or victimless crimes), the length of time on parole, and the overall adjustment on parole.

103.4    Rehearings for a violator who has less than five (5) years remaining to be served and whose release was revoked solely on the basis of technical violations of the conditions of release shall ordinarily be held six (6) months from the last Board action.

103.5    The rehearing for a violator who has less than five (5) years remaining to be served and whose release was revoked on the basis of a new misdemeanor conviction or a new misdemeanor conviction and technical violations shall ordinarily be held from six (6) to nine (9) months from the last Board action.

103.6    The rehearing for a violator who has less than five (5) years remaining to be served and whose release was revoked on the basis of a new felony conviction or a new felony conviction and other violations of release shall ordinarily be held from nine (9) to fifteen (15) months from the last Board action.

103.7    The rehearing for a violator who has five (5) or more years remaining to be served and whose release was revoked solely on the basis of technical violations shall ordinarily be held from six (6) to nine (9) months from the last Board action.

103.8    The rehearing for a violator who has five (5) or more years remaining to be served and whose release was revoked on the basis of a new misdemeanor conviction or a new misdemeanor conviction and technical violations shall ordinarily be held from nine (9) to fifteen (15) months from the last Board action.

103.9    The rehearing for a violator who has five (5) or more years remaining to be served and whose release was revoked on the basis of a new felony conviction or a new felony conviction and other violations of release shall ordinarily be held from fifteen (15) to twenty-four (24) months from the last Board action.

103.10   The Board may establish any rehearing date it determines to be proper, regardless of the length of sentence involved or the time remaining to be served.

## 199     DEFINITIONS

199.1     When used in this chapter, the following terms and phrases shall have the meanings ascribed:

**Board** – the District of Columbia Board of Parole.

**Committed youth offender** – an individual committed pursuant to the provisions of 18 USC 5010(b) or 5010(c) of the Youth Corrections Act for training and treatment.

**Conditional release from supervision** – release from active supervision as a parolee prior to the final termination date of commitment.

**Conditions of parole** – those conditions of parole promulgated by the Board to govern the conduct of all parolees and mandatory releasees under supervision.

**Conditions of parole, special** – conditions imposed for a specific individual in addition to the regular conditions of parole.

**Conditions of parole, technical violation of** – a breach of one (1) or more of the conditions of parole established by the Board.

**Conditions of parole, violation of** – a breach of one (1) or more of the conditions of parole established by the Board, including a commission of a new and separate criminal offense.

**Controlled substances** – has the same meaning as that provided in D.C. Law 4-29 (D.C. Code §§33-512 through 523) as it may from time to time be amended.

**Drug paraphernalia** – has the same meaning as that provided in D.C. Laws 4-29 and 4-149 (D.C. Code §§33-550, §§33-6601 through 603) as they may from time to time be amended.

**Good time, industrial** – a deduction, over and above the allowable statutory good time from the term or terms imposed at a rate not to exceed that which is prescribed by 18 USC 4162 for prisoners actually employed in an industry or camp.

**Good time, meritorious** – a deduction from the term or terms imposed over and above the allowable statutory good time at a rate not to exceed that which is prescribed by 18 USC 4162 for prisoners performing exceptionally meritorious services or performing duties of outstanding importance in connection with institutional operations.

**Good time, statutory** – a deduction from the term or terms imposed at a rate prescribed by 18 USC 4161 and D.C. Code, §24-405 for good conduct.

**199    DEFINITIONS**    (Continued)

**Hearing, initial** - a prisoner's personal appearance before the Board in cases where the Board is to establish the parole eligibility date for purposes of setting that date. For a youth offender, a hearing conducted to establish or reinforce the training and treatment program, clarify goals to be achieved, and determine the estimated time that will be required for accomplishment of the goals, in order to establish an institutional review hearing date.

**Hearing, institutional review** - a review hearing for a youth offender that is conducted by the Board on the date previously set by the Board subsequent to the initial hearing.

**Hearing, original parole** - a prisoner's personal appearance before the Board or its designated examiner for parole consideration upon expiration of the minimum sentence imposed or after serving one-third (1/3) of the maximum sentence imposed.

**Hearing, revocation** - a hearing conducted by the Board to permit an alleged violator, his or her attorney (if desired by the alleged violator), and witnesses to respond to charges of violation of any condition of parole did occur and take further action in keeping with the overall circumstances.

**Mandatory release** - when a prisoner, having served his or her term or terms less good time deductions is, upon release, deemed to have been released on parole until the expiration of the maximum term or terms imposed, less one hundred eighty (180) days. For youth offenders, the date on which the statute requires that the committed youth offender be released from further institutional care to supervision until the final expiration date of commitment.

**Observation and study commitment** - a temporary commitment to a designated center for evaluative study and observation of a youth offender to determine if the individual would derive benefit from existing youth center programs.

**Parole** - release under supervision for the balance of the sentence remaining to be served. For youth offenders, (also referred to as "youth conditional release") a board directed release under supervision for the balance of the commitment, occurring at any time prior to the statutory release date.

**Preliminary interview** - an interview conducted by the Board's examiner to advise an alleged violator of his or her procedural rights and also for the purpose of gathering facts and information concerning a releasee's alleged violation(s) of the conditions of his or her parole.

**Rehearing** - a prisoner's personal appearance before the Board or its designated examiner for reconsideration for parole after having being denied parole at an initial hearing.

**Unconditional discharge** - release from further supervision and discharge from further custody of the commitment prior to the final expiration date by issuance by the Board of an order and certificate setting aside the conviction and expunging the record.

**Youth offender** - any individual eligible for commitment under the provisions of the Youth Corrections Act (18 USC 5005) at time of conviction.

A6

## CHAPTER 2     PAROLE OF ADULT PRISONERS

**200     ELIGIBILITY FOR PAROLE AND INITIAL HEARING**

200.1   In accordance with D.C. Code, §24-204 the Board shall be authorized to release a prisoner on parole in its discretion after he or she has served the minimum term or terms of the sentence imposed or after he or she has served one-third (1/3) of the term or terms for which he or she was sentenced, as the case may be, <u>if</u> the following criteria are met:

    (a) The prisoner has observed substantially the rules of the institution;

    (b) There is reasonable probability that the prisoner will live and remain at liberty without violating the law; and

    (c) In the opinion of the Board, the release is not incompatible with the welfare of society.

200.2   The Board, upon receipt of classification and evaluation material (which is to be received sixty (60) days after commitment), shall conduct an initial hearing for prisoners for whom the Board is required to establish parole eligibility.

200.3   At the initial hearing under §200.2, the Board shall establish a parole eligibility date and may do the following:

    (a) Grant parole, on or after the established date;

    (b) Deny parole; or

    (c) Continue the case to the established eligibility date.

200.4   Ordinarily, the Board shall not establish a parole eligibility date that would exceed one-third (1/3) of the maximum sentence imposed.

A7

**204**    **PROCEDURES FOR GRANTING PAROLE**    (Continued)

204.21    In determining whether to release on parole an adult or a youth
offender appearing before the Board at a parole rehearing, the
Board shall take the total point score from the initial hearing
and adjust that score according to the institutional record of
the candidate since the last hearing pursuant to Appendix 2-2.
The Board shall then take one of the following actions:

(a)  IF POINTS = 0-3:       Parole shall be granted at this
                            rehearing with highest level or
                            supervision required; or

(b)  IF POINTS - 4-5:       Parole shall be denied and a
                            rehearing date scheduled.

204.22    The Board may, in unusual circumstances, waive the SFS and the
pre and post incarceration factors set forth in this chapter to
grant or deny parole to a parole candidate.  In that case, the
Board shall specify in writing those factors which it used to
depart from the strict application of the provisions of this
chapter.

## 205    GRANTING PAROLE:  LOSS AND RESTORATION OF GOOD TIME

205.1    In general, the Board shall not grant parole unless the prisoner has substantially observed the rules of the institution in which he or she is confined.

205.2    Since the forfeiture of good time indicates that the prisoner has violated the rules of the institution to a serious degree, and that the prisoner may lack the emotional controls necessary for making a satisfactory adjustment in the community, parole shall not be granted where a forfeiture of good time remains on the record.

205.3    In exceptional cases, where it appears warranted on the basis of the prisoner's whole record, parole may be granted notwithstanding the fact that the forfeited good time has not been restored.

205.4    In other cases, parole may be granted conditionally pending restoration of the forfeited good time.

205.5    In no case shall forfeited good time abridge the right of a prisoner to apply for or receive a parole hearing.


## 206    PAROLE TO DETAINER

206.1    The policy and practice of the Board with regard to parole to detainers shall be generally in accord with the principles recommended by the Association of the Interstate Compact for the Supervision of Parolees and Probationers.

206.2    The status of detainers placed against prisoners in District of Columbia correctional institutions shall be investigated so far as is reasonably possible prior to parole hearings.

206.3    The Board may grant parole to a detainer if a prisoner is in other respects considered a good parole risk.

206.4    Arrangements for supervision by another jurisdiction holding a detainer shall be made prior to issuing a release certificate if the jurisdiction holding the detainer is the prisoner's intended state of residence.

206.5    Alternate release plans shall be formulated and approved by the Board for prisoners paroled to a detainer when the following criteria apply:

(a) The prisoner, after disposition of the detainer has been made, is still accountable to the Board; and

(b) The prisoner's approved place of residence will be the District of Columbia.

## 207    CONDITIONS OF RELEASE

207.1    Where parole has been granted and an effective release date has been
set, actual release on parole on that date shall be conditioned upon
the individual maintaining a good institutional conduct record and
the completion of a satisfactory approved release plan for
supervision.

207.2    The Board may reconsider any case prior to the actual release date on
its own motion, and may advance or postpone the effective release
date, or rescind and deny a parole previously granted.

207.3    The Board may also, on its own motion, reconsider any case where
parole has been previously considered and denied, and may grant
parole previously denied.

207.4    After a prisoner has been granted parole, the Board shall be notified
of any serious breach of institutional rules committed by the
prisoner prior to date of actual release.

207.5    Prisoners reported for violations prior to release shall not be
released until the institution has been advised that no change has
been made in the Board's order granting parole.

207.6    Parole is granted subject to the conditions imposed by the Board as
set forth in the Certificate of Parole. When parole is granted in
the District of Columbia the parolee shall agree to do the following:

(a) Obey all laws;

(b) Report immediately upon release to his or her assigned parole
officer for instructions;

(c) Remain within the geographic limits fixed in the parole
certificate unless official approval is obtained;

(d) Refrain from visiting illegal establishments;

(e) Refrain from possessing, selling, purchasing, manufacturing or
distributing any controlled substance, or related paraphernalia;

(f) Refrain from using any controlled substance or drug paraphernalia
unless such usage is pursuant to a lawful order of a practitioner
and the parolee promptly notifies the Board and his or her parole
officer of same;

(g) Be screened for the presence of controlled substances by
appropriate tests as may be required by the Board or the Chief
Parole Officer;

(h) Refrain from owning, possessing, using, selling, or having under
his or her control any deadly weapon or firearms;

207    CONDITIONS OF RELEASE    (Continued)

207.6    (Continued)

(i) Find and maintain legitimate employment, and support legal dependents;

(j) Keep the parole officer informed at all times relative to residence and work;

(k) Refrain from entering into any agreement to act as an informer or special agent for any law enforcement agency; and

(1) Cooperate with the Board and those responsible for his or her supervision and carry out all instructions of his or her parole officer or special conditions imposed by the Board.

207.7    The Board shall add the following as a condition of release for those already on parole: **that all parolees be screened for the presence of controlled substances by appropriate tests as may be required by the Board or the Chief of Parole.**

207.8    A positive test result for the presence of a controlled substance shall be evidence that a parolee used the drug for which he or she tested positive.

207.9    The Board may add to, modify, or delete any condition of parole at anytime.

207.10    If any change in the conditions of parole is ordered by the Board, the parole officer shall advise the parolee.


208    RELEASE PLANNING

208.1    The details of each plan for release shall be verified by the Supervision Unit of the Department of Corrections.

208.2    In cases where parole has been granted but release plans have not been submitted by the prisoner for investigation, the Supervision Unit shall assist in formulating release plans, and shall submit the plans following investigation to the Board for approval.

208.3    All grants of parole shall be conditional on the formulation of acceptable and suitable release plans.

208.4    Release certificates shall not be issued until a release plan has been approved by the Board.

208.5    If all efforts to formulate and verify an acceptable suitable parole plan prove futile, the Board shall be notified in a detailed report submitted no later than thirty (30) days after the effective release date.

**208    RELEASE PLANNING    (Continued)**

208.6    The following shall be considered in the formulation of a release
plan for approval and eligibility:

(a) Evidence that the parolee will have an acceptable residence and
will be legitimately employed immediately upon release;
Provided, that in special circumstances, the requirement for
immediate employment upon release may be waived by the Board;

(b) Assurance that necessary aftercare will be available for parolees
who are ill, or who have any other demonstrable problems in which
special care is necessary, such as hospital facilities or other
domiciliary care; and

(b) Assurance of availability of and acceptance in a community
program in those cases where parole has been granted conditioned
upon acceptance or participation in a specific community program.


**209    RELEASE AND TRAVEL TO OTHER JURISDICTIONS**

209.1    The Board, in its discretion, may parole any individual to live and
remain in a state other than the District of Columbia if the
authorities of the intended state of residence accept the prisoner
for supervision, and suitable release plans have been developed and
approved by the Board.

209.2    Whenever it appears to the Board that there is a reasonable
probability that a parolee could, if present in another state, obtain
employment and establish an acceptable place of residence, and could
reside in that state without violating the law, the Board may
authorize the parolee's travel to that state without prior
communication with the state authorities.

209.3    The Board shall request state supervision when evidence of suitable
employment and residence has been submitted by the parolee and
received by the Board.

209.4    Any parolee permitted to travel to another state for the purpose of
re-establishing himself or herself as a law-abiding citizen of that
state who fails to do either of the following shall be deemed a
violator of the conditions of release and a warrant for arrest and
return shall be issued by the Board:

(a) Communicate with the Board as directed; or

(b) Return to the District of Columbia when ordered to do so by the
Board.

## 210  TEMPORARY TRAVEL TO OTHER JURISDICTIONS

210.1  The supervising parole officer may authorize travel to another jurisdiction to permit a parolee to attend the funeral of a deceased relative, visit a seriously ill relative, or for employment purposes.

210.2  Authorization of temporary travel shall not require prior approval of the Board, except as provided in §210.6.

210.3  Authorization for temporary travel shall not exceed thirty (30) days.

210.4  Authorization shall be given to the parolee in written form, and a copy shall be sent to the Board.

210.5  Travel for vacation purposes not exceeding a weekend nor a distance of approximately fifty (50) miles from the District of Columbia may be approved by the parole officer without prior Board approval.

210.6  Any extended vacation trips or travel exceeding the limits set forth in §§210.3 or 210.5 shall first be approved by the Board.


## 211  CHANGES IN RELEASE PLANS

211.1  The release plan approved and accepted by the Board may be changed after release upon application to and acceptance by the Chief Parole Officer of the Department of Corrections and approval by the Board.

211.2  Any special conditions established by the Board shall remain in effect unless the Board specifically modifies or rescinds those conditions.


## 212  MANDATORY RELEASE

212.1  When a prisoner has been denied parole at the original hearing and all subsequent hearings, and in those cases where the statutes specifically preclude parole consideration, the prisoner shall be released at the expiration of his or her imposed sentence less the time deducted for any good time allowances provided by the statutes.

212.2  Any prisoner having served his or her term or terms less deduction for good time shall, upon release, be deemed to be released on parole until the expiration of the maximum term or terms for which he or she was sentenced, less one hundred eighty (180) days.

212.3  Each prisoner released in accordance with this section, shall be under the jurisdiction of the Board of Parole and subject to parole supervision.

A13

**213    SUPERVISION OF PAROLEES**

213.1   The Department of Corrections shall provide parole supervision services for all prisoners, including committed youth offenders, paroled or released on mandatory release from a correctional institution or facility of the District of Columbia.

213.2   Supervision of all prisoners under the control of the Board of Parole shall be vested in the Chief Parole Officer for the Department of Corrections.

213.3   The Chief Parole Officer shall be responsible for formulating release plans for all prisoners under the jurisdiction of the Board.

213.4   The Chief Parole Officer shall cause all parolees to be screened periodically by appropriate tests for the presence of controlled substances.

213.5   As soon as he or she has access to any parolee who has been arrested, the Chief Parole Officer shall promptly cause the parolee to be screened by appropriate tests for the presence of controlled substances.

213.6   The Chief Parole Officer shall notify the Board of all parolees with positive test results, i.e., those with a detectable level of controlled substances.

213.7   The Chief Parole Officer shall promptly notify the Board whenever a parolee or mandatory releasee under the jurisdiction of the Board has been accused of committing a crime, implicated in criminal activity, or alleged to have violated any other conditions of parole.

213.8   The Chief Parole Officer shall request the Board to issue a violator warrant for any parolee with a posititve test result for phencyclidine, or a phencyclidine immediate precursor (PCP) in violation of his or her conditions of parole.

213.9   The Chief Parole Officer may request that the Board issue a violator warrant for a parolee accused of a new criminal offense.

213.10  Upon receipt of information by the Office of Parole Supervision that a parolee or mandatory releasee under jurisdiction of the Board has been accused of committing a crime, implicated in criminal activity, or alleged to have violated any other condition of parole, the Office shall bring that information, along with a detailed report as to the parolee's overall adjustment while under supervision, to the attention of the Board.

**213    SUPERVISION OF PAROLEES    (Continued)**

213.11  Parole officers shall submit an annual summary review on the progress of each parolee and mandatory releasee under their supervision who, upon release, will be under actual supervision for thirty (30) months or more.

213.12  Annual reviews shall be submitted to the Board during the month in which the anniversary of the date the releasee came under actual supervision occurs.

**214    RELEASE FROM SUPERVISION**

214.1   The Board, in its discretion, may release a parolee or mandatory releasee from further supervision prior to the expiration of the maximum term or terms for which he or she was sentenced.

214.2   Consideration for release from parole supervision shall be given, but not limited to, those parolees who will be under supervision for a period of thirty (30) months or more.

214.3   Consideration for release from supervision of parolees who have a parole supervision period of less than thirty (30) months shall be given only in those cases where exceptional or unusual circumstances exist.

214.4   Recommendations for release from supervision shall not be considered for any parolee or mandatory releasee who has not been under active supervision for at least one (1) year.

214.5   Consideration for release from supervision shall be exercised by the Board during an annual summary review of parole cases at the expiration of each year of parole supervision.

A15

214    **RELEASE FROM SUPERVISION**    (Continued)

214.6    At the expiration of each year of supervision in a parole case, the
parole officer shall submit to the Board a written report on the
community adjustment which the parolee has made during that period,
together with a recommendation for or against his or her release from
further parole supervision and the reasons for the recommendation.

214.7    Each report for release from parole supervision shall include a
signed statement from the unit supervisor of the parole officer,
indicating whether the unit supervisor approves or disapproves the
recommendation of the parole officer. The statement of the unit
supervisor shall include the supervisor's reasons for approving or
disapproving the recommendation.

214.8    Reports concerning release from supervision shall be considered by at
least two (2) members of the Board, and a decision shall be by
majority vote.

214.9    No hearing shall be required for Board action on any of the reports
required by this section.

215    **ORDER OF RELEASE**

215.1    When the Board approves a recommendation for release from further
supervision, a written order of release from supervision shall be
issued and signed by at least two (2) members of the Board.

215.2    A copy of the order of release shall be delivered to the releasee.

215.3    Each order of release shall state that the conditions of the
releasee's parole are waived, except the condition that the shall not
violate any law or engage in any conduct which might bring discredit
to the parole system, under penalty of possible revocation of parole
or of the order of release.

215.4    An order of release from supervision shall not release the parolee
from the custody of the Attorney General or the jurisdiction of the
Board before the following date, whichever is applicable:

(a) The maximum date of the term or terms imposed; or

(b) In the case of mandatory releasees, the maximum date of the term
or terms imposed, less one hundred eighty (180) days.

215.5    An order of release shall not relieve a parolee of the responsibility
to live a law-abiding and reputable life.

## 216    REVOCATION OF THE ORDER OF RELEASE

216.1    If, after an order of release from supervision has been issued by the Board (but prior to the expiration of the sentence(s) imposed or, in the case of a mandatory release, the expiration date of the maximum period of supervision), the parolee commits any new criminal offense or engages in any conduct which might bring discredit to the parole system, the Board, may, in its discretion, do any of the following:

(a) Issue a warrant for the parolee' return to custody as a violator;

(b) Rescind the order of release from supervision and return the parolee to active supervision; or

(c) Impose any special conditions to the order of release from supervision.


## 217    ISSUANCE OF WARRANTS

217.1    A warrant for the detaining or the retaking or any person under the jurisdiction of the District of Columbia Board of Parole may be issued by the Board or a member of the Board.

217.2    In cases of parolees, a violator warrant may be issued any time up until the maximum term of the parolee's sentence. In the case of the mandatory releasees, who are under supervision as if on parole, that action may be forthcoming up until the expiration date of the maximum term, less one hundred eighty (180) days.

217.3    The Board or a member of the Board may elect to issue a violator warrant in those cases where the only violation of parole is the alleged new offense for which the parolee has been arrested. The Board shall make a written determination as to whether there is probable cause to believe that the parolee has committed the crime for which he or she was arrested and as to the following:

(a) Risk to the community if the parolee is allowed to remain on parole;

(b) History of the parolee while under supervision;

(c) Whether the parolee has other outstanding criminal charges; and

(d) Seriousness of the offense for which the parolee has been arrested.

217.4    Conviction for a Federal, State, or local crime committed subsequent to release on parole shall constitute probable cause.

A17

**217    ISSUANCE OF WARRANTS**

217.5   The Board or a member of the Board may also elect to issue a violator
        warrant where there is probable cause to believe that the parolee has
        violated a condition of parole other than the alleged commission of a
        new offense.

217.6   With respect to the discretionary issuance of a violator warrant, the
        following shall apply:

        (a) Action shall be taken in context of an analysis of all pertinent
            information and circumstances surrounding the alleged violation
            and shall consider the history of the parolee while under
            supervision, including, among other factors, the following:

            (1) Any previous drug law violations;

            (2) Employment status;

            (3) Enrollment and pattern of participation in treatment
                programs;

            (4) Family stability:

            (5) Other violations of parole conditons; and

            (6) Whether the alleged violations represent a pattern of abuse
                which is indicative of serious problems with parole
                adjustment; and

        (b) It shall be the general policy of the Board to issue a violator
            warrant if there is evidence of illegal distribution, purchase,
            possession, or use of any controlled substance.

217.7   The Board shall issue a violator warrant when the Board or member
        thereof determines that there is probable cause to believe the
        following:

        (a) That the parolee violated or attempted to violate any of the
            following provisions of the criminal code of the District of
            Columbia (or committed any equivalent act in any other
            jurisdiction), for which he or she was arrested:

            (1) D.C. Code §22-2101 (Abduction);

            (2) D.C. Code §22-501 (Aggravated Assault);

            (3) D.C. Code §22-401 (Arson);

            (4) D.C. Code §22-1801 (Burglary);

            (5) D.C. Code §6-2311, §22-3202 and §22-3203 (Firearms
                Violations);

A18

217    ISSUANCE OF WARRANTS

217.7    (Continued)

   (6) D.C. Code §22-501, §22-2401 or §22-2403 (Homicide);

   (7) D.C. Code §22-2901 (Robbery);

   (8) D.C. Code §22-2801 and §22-3501 (Sexual Assault); or

   (9) D.C. Code §33-541, §33-542, §33-543 and §§33-603 (Felony Drug Law Violations); or

   (b) That the parolee has violated a condition of his or her parole by use, possession, sale, purchase, manufacture, or distribution of phencyclidine, or a phencyclidine immediate precursor (PCP).

218    DISPOSITION OF ISSUED WARRANTS

218.1    If the Board issues a violator warrant, it shall direct what action(s) shall be taken concerning the disposition of the warrant. The Board may order the following actions:

   (a) That the warrant be issued and executed, so that the alleged violator is taken into custody on a warrant;

   (b) That the warrant be placed as a detainer against the alleged violator if he or she is in custody on a new pending charge;

   (c) That the warrant be executed if the violator is in custody and charges against him or her have been adjudicated; or

   (d) That the warrant be placed as a detainer against the violator if he or she is in the custody of another jurisdiction.

218.2    The Board may recall a warrant that it has issued prior to execution of that warrant. If the Board recalls the warrant, it shall either hold further disposition in abeyance, rescind the warrant, or take appropriate action.

218.3    The Board shall review the disposition of each warrant issued as a detainer every six (6) months. The Board may, on its own initiative or following a petition from other sources, give earlier consideration to the status of a detainer.

218.4    The Board shall consult with the Office of the United States Attorney for the District of Columbia and may consult with other appropriate criminal justice agencies whenever it reviews the disposition of detainers.

**218    DISPOSITION OF ISSUED WARRANTS    (Continued)**

218.5   The Board may, if it chooses, conduct a dispositional interview with the prisoner at the place of his or her confinement before taking any action. If that dispositional interview is conducted, the Board shall permit the presence of an attorney and witnesses, if they are desired, under the same conditons as exist with reference to revocation hearings.

218.6   Either upon interview by the Board or its examiner or a review of the record, the Board may do the following:

(a) Let the detainer stand;

(b) Execute the warrant, and schedule a revocation hearing;

(c) Order the warrant withdrawn and thus remove the detainer, or

(d) Continue the case pending receipt of further information.

218.7   Any action as concerns disposition of a detainer shall be by majority decision of the Board.

218.8   Where a detainer has been issued pursuant to the Five-Day (5) Hold provisions of §23-1322(e), D.C. Code, 1981 ed., and there has not been significant progress made on the processing of the case against the alleged violator by the court or procsecutor six (6) months following that issuance, the Board may lift the detainer or enter an order of reinstatement in the case of an executed warrant. Prior to taking that action, however, the Board shall consult with the Office of the United States Attorney and may consult with other appropriate criminal justice agencies relative to the status of case adjudication.

218.9   Any authorized officer of the District of Columbia Department of Corrections, member of the District of Columbia Metropolitan Police Department or Federal officer authorized to serve criminal process within the United States, to whom a warrant for the retaking of a parole or mandatory release violator is delivered, shall in keeping with instructions of the Board, act on that warrant by placing a detainer or by taking that prisoner and returning or removing him or her to the place of confinement from which he or she was paroled or mandatorily released or to the place of confinement as may be designated by the Attorney General of the United States.

**219    REVOCATION OF PAROLE: PRELIMINARY INTERVIEWS AND REVOCATION HEARING**

219.1   An alleged parole violator retaken under a warrant issued by the Board or a member thereof has the right to have a preliminary interview conducted by the Board, a member of the Board, an examiner or an official designee at or reasonably near the place of the alleged parole violation or arrest, without unnecessary delay. The purpose of the preliminary interview shall be to give the alleged violator notice of the following:

219    REVOCATION OF PAROLE:  PRELIMINARY INTERVIEWS AND REVOCATION HEARING
       (Continued)

219.1   (Continued)

(a) The condition(s) of parole alleged to have been violated or
    offense(s) alleged to have been committed;'

(b) The right to written notice of the claimed violations or parole;
    disclosure to the parolee of evidence against him or her; and
    opportunity to be heard in person, to present witnesses and
    documentary evidence, and to confront and cross-examine adverse
    witnesses (unless the hearing officer specifically finds good
    cause for not allowing confrontation) at a hearing before the
    Board or a member of the Board; and a written statement of the
    Board's final determination;

(c) The approximate time, place, and purpose(s) of the revocation
    hearing; and

(d) That if he or she admits the charge(s) and waives his or her
    right to be represented by counsel, and to present and confront
    witnesses at a revocation hearing before the Board or a member
    thereof, the person conducting the preliminary interview will
    conduct the revocation hearing at that time and place.

219.2   The Board or a member may review the record in lieu of conducting a
        revocation hearing upon a written determination that at the
        preliminary interview the following occurred:

(a) The parolee knowingly and intelligently admitted committing the
    alleged offense or violating conditions of parole; and

(b) The parolee knowingly and intelligently waived his or her right
    to be represented by counsel, and to present and confront
    witnesses at a revocation hearing before the Board or a member
    thereof.

219.3   If the parolee chooses to exercise his or her right to a revocation
        hearing before the Board or a member of the Board, the revocation
        hearing shall be held at or reasonably near the place of the alleged
        parole violation or arrest, within sixty (60) days of the preliminary
        interview.

219.4   If the revocation hearing is conducted by a member of the Board or an
        examiner, that member or examiner shall submit proposed findings,
        conclusions and recommendations in writing to the Board.  Only the
        Board may thereafter terminate parole or modify the terms and
        conditions of parole.

219.5   If the Board finds after a revocation hearing that the preponderance
        of evidence does not establish a violation of the conditions of
        parole, the Board shall immediately reinstate the parolee to parole
        supervision.

**219   REVOCATION OF PAROLE:  PRELIMINARY INTERVIEWS AND REVOCATION HEARING**
(Continued)

219.6   If the Board finds after a revocation hearing that by a preponderance of evidence the parolee has violated a condition of his or her parole, the Board may take any of the following actions:

(a) Reinstate the parolee to supervison;

(b) Reprimand the parolee;

(c) Modify the parolee's conditions of parolee;

(d) Refer the parolee to a residential community treatment center for all or part of the remainder of his or her original sentence; or

(e) Formally revoke parole or release.

219.7   If the Board finds by a preponderance of evidence that a parolee has violated a condition of his or her parole by the use, sale, possession, purchase, manufacture, production, or distribution of phencyclidine, or a phencyclidine immediate precursor (PCP), the Board shall revoke parole.

219.8   In determining whether or not parole should be revoked, in those instances not covered in §219.7, when one (1) or more violations have been proved by a preponderance of evidence, the Board shall utilize among others, the following criteria which shall be explicitly addressed in the Board's written decision relative to the case:

(a) Risk to the community if the parolee is allowed to remain on parole supervison;

(b) Seriousness of violation or violations with which the parolee has been charged or of which the parolee has been convicted;

(c) Whether violations represent a continuing pattern or are indicative of serious adjustment problems which evidence a disrespect for the parole system or which could lead to further criminal involvement;

(d) Whether the criminal charge or conviction involves one (1) or more of the offenses or violations set forth in §217.7 of this chapter;

(e) Whether the parolee has other outstanding criminal charges; and

(f) Whether there is evidence of other negative adjustment by the parolee while under supervisions.

219    REVOCATION OF PAROLE:  PRELIMINARY INTERVIEWS AND REVOCATION HEARING
       (Continued)

219.9   Counsel may be retained by the parolee, or if he or she is
        financially unable to retain counsel, represntation may be obtained
        pursuant to applicable provisions of the District of Columbia
        Criminal Justice Act, §§11-2601 et seq., D.C. Code, 1981 ed.  Neither
        the Board nor its staff shall initiate action or make any arrangement
        to obtain legal representation or witnesses for the alleged violator.

219.10  The alleged violator or his or her attorney shall secure witnesses to
        appear on his or her behalf.  Witnesses shall appear voluntarily.

219.11  Neither the alleged violator nor his or her witnesses shall be placed
        under oath during the preliminary interview or the revocation
        hearing.

219.12  The Board shall furnish the parolee with a written notice of its
        determination not later than twenty-one(21) days, excluding holidays,
        after the date of the revocation hearing.  If parole is revoked, a
        digest shall be prepared by the Board setting forth in writing the
        factors considered and reasons for that action, a copy of which shall
        be given to the parolee.


220    SERVICE OF VIOLATION TIME

220.1   If the Board orders that parole or mandatory relase be revoked and
        terminated, the prisoner, unless subsequently reparoled, shall serve
        the remainder of the sentence originally imposed less any commutation
        for good conduct which may be earned by him or her after his or her
        return to custody.

220.2   The time a prisoner was on parole or mandatory release shall not be
        taken into account to diminish the time for which he or she was
        sentenced.

§§221 - 229:  RESERVED

**230    CONDITIONAL RELEASE OF YOUTH OFFENDERS**

230.1    When a youth offender has been sentenced under 18 USC 5010(e) for
observation and study, the receiving institution shall prepare a
report of its findings for the Board of Parole.

230.2    Upon receipt of the institutional report, within sixty (60) days
after the date of commitment, the Board shall prepare and send its
report to the committing judge.  The report shall summarize the
institution's findings and recommend what the Board considers to be
the best available treatment plan.

230.3    The Board may at any time order the conditional release of a youth
offender and direct that he or she be placed under parole supervision
in the community subject to established conditions and rules which
are to govern his or her activities and behavior while he or she is
under supervision.

230.4    All youth offenders committed under the provisions of 18 USE 5010(b)
or 5010(c) shall be eligible to be paroled by Board action within
sixty (60) days after commitment to a facility or institution
operated directly by or under contract to the D.C. Department of
Corrections.

230.5    All Board decisions relating to any action taken within the purview
of the Board's jurisdiction regarding approval of parole or setting
of institutional review hearing dates, shall be by majority vote of
the Board.

230.6    Pursuant to 18 USC 5018, the Board may revoke or modify any of its
previous orders respecting a committed youth offender, except an
order of discharge where it has acted to set aside the conviction,
before the expiration of the maximum sentence imposed upon a
committed youth offender.

DISTRICT OF COLUMBIA BOARD OF PAROLE

### Notice of Final Rulemaking

The District of Columbia Board of Parole, with the concurrence of the Department of Corrections, on February 11, 1985, took final action to adopt the following amendments to sections 199, 207, 213, 217 through 224 of Title 28 D.C. Municipal Regulations. These sections relate to parole supervision, issuance of parole violator warrants and parole revocation procedures. These sections were formerly designated Chapter 11, Part II, Sections 105.5, 106.6, 200 through 200.2 and 300 through 305 of Title 9, D.C. Rules and Regulations. Comments were received which resulted in some changes being made to the text of the proposed rules as published with the Notice of Proposed Rulemaking in the D.C. Register on December 7, 1984, at 31 D.C.R. 6116 which superseded the Notice of Proposed Rulemaking published in the D.C. Register on August 3, 1984 (31 D.C.R. 3891). These changes do not, however, alter the intent, meaning, or application of the regulations as published under the notice of proposed rulemaking. These final rules will be effective when published in the D.C. Register.

### Amendments

Section 199, Definitions, is amended by inserting the following:

"Controlled substances" has the same meaning as that provided in D.C. Law 4-29 (D.C. Code §§33-512 through 523) as it may from time to time be amended.

"Drug paraphernalia" has the same meaning as that provided in D.C. Laws 4-29 and 4-149 (D.C. Code §33-550, §§33-601 through 603) as they may from time to time be amended.

Section 207, Conditions of Release, is amended as follows:

(a)  By renumbering subsections 207.6 and 207.7 as subsections 207.9 and 207.10, respectively.

(b)  By inserting a new subsection 207.6 to read as follows:

207.6   Parole is granted subject to the conditions imposed by the Board as set forth in the Certificate of Parole. When parole is granted in the District of Columbia the parolee shall agree to do the following:

(a)  Obey all laws;

(b)  Report immediately upon release to his or her assigned parole officer for instructions;

(c)  Remain within the geographic limits fixed in the parole certificate unless official approval is obtained;

(d)  Refrain from visiting illegal establishments;

1511

A25

218.4    The Board shall consult with the Office of the United States Attorney
for the District of Columbia and may consult with other appropriate
criminal justice agencies whenever it reviews the disposition of
detainers.

218.5    The Board may, if it chooses, conduct a dispositional interview with
the prisoner at the place of his or her confinement before taking any
action.  If that dispositional interview is conducted, the Board shall
permit the presence of an attorney and witnesses, if they are desired,
under the same conditions as exist with reference to revocation
hearings.

218.6    Either upon interview by the Board or its examiner or a review of the
record, the Board may do the following:

(a)    Let the detainer stand;

(b)    Execute the warrant, and schedule a revocation hearing;

(c)    Order the warrant withdrawn and thus remove the detainer, or

(d)    Continue the case pending receipt of further information.

218.7    Any action as concerns disposition of a detainer shall be by majority
decision of the Board.

218.8    Where a detainer has been issued pursuant to the Five-Day Hold pro-
visions of D.C. §23-1322 (e) and there has not been significant pro-
gress made on the processing of the case against the alleged violator
by the court or prosecutor six (6) months following that issuance,
the Board may lift the detainer or enter an order of reinstatement
in the case of an executed warrant.  Prior to taking that action,
however, the Board shall consult with the Office of the United
States Attorney and may consult with other appropriate criminal
justice agencies relative to the status of case adjudication.

218.9    Any authorized officer of the District of Columbia Department of
Corrections, member of the District of Columbia Metropolitan Police
Department or Federal officer authorized to serve criminal process
within the United States, to whom a warrant for the retaking
of a parole or mandatory release violator is delivered, shall in
keeping with instructions of the Board, act on that warrant by
placing a detainer or by taking that prisoner and returning or
removing him or her to the place of confinement from which he or she
was paroled or mandatorily released or to such place of confinement
as may be designated by the Attorney General of the United States.

Section 219, Revocation of Parole:  Preliminary Interviews and Revocation Hearing.

219.1    An alleged parole violator retaken under a warrant issued by the
Board or a member thereof has the right to have a preliminary inter-
view conducted by the Board, a member of the Board, an examiner or
an official designee at or reasonably near the place of the alleged
parole violation or arrest, without unnecessary delay.  The purpose
of the preliminary interview shall be to give the alleged violator
notice of the following:

**1516**

(a) The condition(s) of parole alleged to have been violated or offense(s) alleged to have been committed;

(b) The right to written notice of the claimed violations or parole; disclosure to the parolee of evidence against him or her; an opportunity to be heard in person, to present witnesses and documentary evidence, and to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation) at a hearing before the Board or a member of the Board; and a written statement of the Board's final determination;

(c) The approximate time, place, and purpose(s) of the revocation hearing; and

(d) That if he or she admits the charge(s) and waives his or her right to be represented by counsel, and to present and confront witnesses at a revocation hearing before the Board or a member thereof, the person conducting the preliminary interview will conduct the revocation hearing at that time and place.

219.2   The Board or a member may review the record in lieu of conducting a revocation hearing upon a written determination that at the preliminary interview:

(a) The parolee knowingly and intelligently admitted committing the alleged offense or violating conditions of parole; and

(b) The parolee knowingly and intelligently wavied his or her right to be represented by counsel, and to present and confront witnesses at a revocation hearing before the Board or a member thereof.

219.3   If the parolee chooses to exercise his or her right to a revocation hearing before the Board or a member of the Board, the revocation hearing shall be held at or reasonably near the place of the alleged parole violation or arrest, within sixty (60) days of the preliminary interview.

219.4   If the revocation hearing is conducted by a member of the Board or an examiner, that member or examiner shall submit proposed findings, conclusions and recommendations in writing to the Board. Only the Board may thereafter terminate parole or modify the terms and conditions of parole.

219.5   If the Board finds after a revocation hearing that the preponderance of evidence does not establish a violation of the conditions of parole, the Board shall immediately reinstate the parolee to parole supervision.

219.6   If the Board finds after a revocation hearing that by a preponderance of evidence the parolee has violated a condition of his or her parole, the Board may take any of the following actions:

A27

(a) Reinstate the parolee to supervision;

(b) Reprimand the parolee;

(c) Modify the parolee's conditions of parole;

(d) Refer the parolee to a residential community treatment center for all or part of the remainder of his or her original sentence; or

(e) Formally revoke parole or release.

219.7 If the Board finds by a preponderance of evidence that a parolee has violated a condition of his or her parole by the use, sale, possession, purchase, manufacture, production, or distribution of phencyclidine, or a phencyclidine immediate precursor (PCP), the Board shall revoke parole.

219.8 In determining whether or not parole should be revoked, in those instances not covered in 219.7, when one or more violations have been proved by a preponderance of evidence, the Board shall utilize among others, the following criteria which shall be explicitly addressed in the Board's written decision relative to the case:

(a) Risk to the community if the parolee is allowed to remain on parole supervision;

(b) Seriousness of violation or violations with which the parolee has been charged or of which the parolee has been convicted.

(c) Whether violations represent a continuing pattern or are indicative of serious adjustment problems which evidence a disrespect for the parole system or which could lead to further criminal involvement;

(d) Whether the criminal charge or conviction involves one or more of the offenses or violations set forth in §217.7 of these Rules;

(e) Whether the parolee has other outstanding criminal charges; and

(f) Whether there is evidence of other negative adjustment by the parolee while under supervision.

219.9 Counsel may be retained by the parolee, or if he or she is financially unable to retain counsel, representation may be obtained pursuant to applicable provisions of the District of Columbia Criminal Justice Act, D.C. Code §§11-2601 et seq. Neither the Board nor its staff shall initiate action or make any arrangement to obtain legal representation or witnesses for the alleged violator.

219.10 The alleged violator or his or her attorney must secure witnesses to appear on his or her behalf. Witnesses shall appear voluntarily.

219.11   Neither the alleged violator nor his or her witnesses shall be placed under oath during the preliminary interview or the revocation hearing.

219.12   The Board shall furnish the parolee with a written notice of its determination not later than twenty-one (21) days, excluding holidays, after the date of the revocation hearing.  If parole is revoked, a digest shall be prepared by the Board setting forth in writing the factors considered and reasons for such action, a copy of which shall be given to the parolee.

Section 220, Service of Violation Time.

220.1    If the Board orders that parole or mandatory release be revoked and terminated, the prisoner, unless subsequently reparoled, shall serve the remainder of the sentence originally imposed less any commutation for good conduct which may be earned by him or her after his or her return to custody.

220.2    The time a prisoner was on parole or mandatory release shall not be taken into account to diminish the time for which he was sentenced.

A29

District of Columbia Register

*36 D.C. Reg.*

FEB 10 1989

GOVERNMENT OF THE DISTRICT OF COLUMBIA

ADMINISTRATIVE ISSUANCE SYSTEM

Mayor's Order  89-10
January 6, 1989

SUBJECT: Delegation of Authority Pursuant to D.C. Law 7-103, the "District of Columbia Board of Parole Amendment Act of 1987"

ORIGINATING AGENCY: Office of the Mayor

By virtue of the authority vested in me as Mayor of the District of Columbia pursuant to section 422(6) of the District of Columbia Self-Government and Governmental Reorganization Act of 1973 as amended, D.C. Code section 1-242(6) (1981 Ed.), and pursuant to D.C. Law 7-103, the "District of Columbia Board of Parole Amendment Act of 1987, (hereinafter the "Act"), effective April 28, 1988, it is hereby ORDERED that:

1.  The Chairperson, District of Columbia Board of Parole, is delegated the authority vested in the Mayor to issue rules and regulations necessary to fully implement the Act and to administer the Act.

2.  EFFECTIVE DATE:  This Order shall become effective immediately.

MARION BARRY, JR.
MAYOR

ATTEST:
DWIGHT S. CROPP
ACTING SECRETARY OF THE DISTRICT
OF COLUMBIA

J-3147—75